## THE CORA P. WHITE.

(District Court, D. New Jersey. May 17, 1917.)

1. MARITIME LIENS ☞1—REQUISITES—STRICT CONSTRUCTION OF LAW.
   A maritime lien, as it may operate to the prejudice of general creditors, will not be extended by analogy or inference.
   [Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 1.]

2. MARITIME LIENS ☞24—SUPPLIES—"FURNISHED TO VESSEL."
   A corporation owned and operated a factory where it manufactured fish products and in connection therewith a fishing fleet. For a number of years it had purchased from the various libelants supplies, consisting of coal, provisions, and fishing appliances. These were all shipped and charged to the corporation, were taken to its factory, and there stored for use at the factory and on the vessels as occasion required. While the libelant who furnished fishing appliances knew from their nature that they were probably intended for use on the vessels, and certain of them were in fact used on the vessel on which it claimed a lien, no vessel was designated in the orders therefor. *Held*, that none of such supplies were furnished "to a vessel," within the meaning of Act June 23, 1910, c. 373, § 1, 36 Stat. 604 (Comp. St. 1916, § 7783), and that none of libelants were entitled to a maritime lien thereunder.
   [Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 30.
   For other definitions, see Words and Phrases, Furnish a Vessel.]

3. MARITIME LIENS ☞64—PLEADING—LACHES.
   Defense of laches, in libel to enforce maritime lien, not raised by the pleadings, cannot be considered.
   [Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 102.]

4. MARITIME LIENS ☞61—LACHES—WHO MAY PLEAD.
   Where the proceeds of the sale of a vessel are insufficient to pay the uncontested liens, defense of laches as to one lien can be raised only by one having a lien.
   [Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 99.]

In Admiralty. Libels against the steamer Cora P. White. On exceptions to commissioner's report. Exceptions sustained.

Howard M. Long, of Philadelphia, Pa., for Pusey & Jones Co., exceptant.

Norman W. Harker, of Philadelphia, Pa., for libelant, Wm. King & Co.

Clarence L. Goldenberg, of Atlantic City, N. J., for libelants, Linen Thread Co. and Pennsylvania Coal & Coke Co.

RELLSTAB, District Judge. On November 1, 1915, the steamer Cora P. White was seized at the instance of certain mariners for unpaid wages due them for services rendered on said vessel. At that time it was owned by the Fifield Fish Oil & Fertilizer Company, a corporation of New Jersey, whose business was to catch fish, manu-

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

facture them into oils and fertilizer, and sell said products. This extraction, etc., were carried on by said company at its factory situated at Manhaden, N. J. This steamer was used by said company during the fishing season of the years 1914 and 1915 in catching fish for said purposes. On November 15, 1915, the company was put into bankruptcy, and its property, other than the proceeds derived from the sale of its vessels, is in the course of administration in the bankruptcy court in this district. The proceeds derived from the sale of this steamer are insufficient to satisfy all the libels filed against it.

The Pusey & Jones Company, one of the libelants claiming a maritime lien for repairs made and supplies furnished to this steamer, during said years, interposed answers to the libels filed by the Pennsylvania Coal & Coke Company, Wm. King & Company, and the Linen Thread Company, who likewise claim maritime liens for supplies furnished to said steamer, in which said answering libelant denies their right to participate in such of said proceeds as remains after payment of the wage claims.

The claims thus drawn in issue are: The Coal Company's for two shipments of coal made in 1915; the King Company's for divers shipments of food, groceries, and culinary supplies, made in the same year; and the Thread Company's for shipments of parts of fishing tackle made in the years 1914 and 1915. Each of these libelants claim a maritime lien on said steamer under the act of June 23, 1910, c. 373 (7 U. S. Comp. Stat. Ann. 1916, p. 8229), and the only question to be decided is whether they were furnished to said vessel or to its owner.

Considering, first, the testimony common to all of these claims, it shows that these supplies, in response to orders of the Fertilizer Company, were all consigned to it before the institution of said bankruptcy proceedings; that all of these libelants, for a number of years prior to the deliveries of these commodities, antedating 1910, had furnished said Fertilizer Company with like supplies on its credit, and for which they had been fully paid; that at no time during said years did the Fertilizer Company direct that any of said supplies be shipped to the steamer, or advise libelants that they, or any part of them, were for any of its vessels; that all these libelants knew the nature of the business that was being carried on by said Fertilizer Company, and that it had a factory and vessels which were used in carrying on said business; that none of them kept any accounts with said steamer or any other vessel of the said Fertilizer Company, or made any consignments to any of them; none of them charged any of said supplies against a "vessel" account, but each charged them to a general account, which they severally kept with the said company; that the Fertilizer Company did not keep any separate account with any of its vessels, but charged all of said supplies against its business generally.

Considering next the testimony applicable only to one or the other of these claims, it shows:

First, as to the libel of the Pennsylvania Coal & Coke Company, that the coal was furnished under a yearly contract to supply the Fertilizer Company with coal as needed, and each shipment was from the mines f. o. b. the piers at Port Richmond, Pa. From there it was taken by

the Fertilizer Company, on boats furnished by it, to its place at Manhaden, N. J., where it was put in a pile, from which it supplied its steamer or factory as it was wanted. The Coal Company understood that some of the coal so shipped would be used at the factory and some on the boat, but it did not know the proportions. Upon delivery of the coal at the piers the Coal Company's responsibility ended, and it was then entitled to the price at which such coal had been sold. Some of said coal was sold by the Fertilizer Company to individuals, and some of it was on hand at the time it went into bankruptcy and was sold by the receiver.

Second, as to the libel of Wm. King & Company, that the food and culinary supplies furnished by this company were shipped f. o. b. Philadelphia, Pa., to Leesburg, N. J., a railroad station near to Manhaden, on mail orders usually received weekly from the Fertilizer Company. From there they were taken by the latter to its factory at Manhaden, where they were put in a storehouse, and used in feeding the men employed on said steamer and at its factory, as occasion required. The King Company also understood that some of the supplies so shipped would be used at the factory and some on the boat, but it did not know in what proportions. Similar supplies were occasionally purchased by the Fertilizer Company from other dealers, and a like use made thereof, but these were very small in quantity as compared with those bought from the King Company.

Third, as to the libel of the Linen Thread Company, that the seine was made up and forwarded in 1914 by the Thread Company on specifications previously furnished by the Fertilizer Company. Other seines had been previously sold said company by this libelant and used on other vessels of said company. This particular seine, and the other articles mentioned in this libel, were sent f. o. b. the places from where shipped, to Leesburg. From there they were taken by the Fertilizer Company to Manhaden and installed on said steamer Cora P. White shortly after they were received, whereupon they became a part of its necessary equipment.

It is to be noted that the articles shipped by the Thread Company were from their very character—parts of fishing tackle—limited to use on a fishing vessel, while the coal, food, and culinary supplies furnished by said Coal and King Companies, respectively, were usable on either a vessel or at the factory, or both,

On the testimony, the commissioner found that, of the quantity of the coal furnished by the Coal Company and used by the Fertilizer Company, three-quarters was used on the steamer; that, of the food and culinary supplies furnished by the King Company, two-thirds was used thereon. He concluded that to that extent these libelants, respectively, had a maritime lien on said steamer, and that the Thread Company had a maritime lien for the entire amount of its claim. The commissioner's findings of fact as to said proportions are not seriously challenged by exceptant, and if the deliveries as made by these libelants are a furnishing to this steamer, as distinguished from a common-law sale and delivery to the owner, his conclusions must be sustained.

[1] A maritime lien is a jus in re, and, as it may operate to the prejudice of general creditors, it will not be extended by analogy or

inference. The Yankee Blade, 19 How. (60 U. S.) 86, 89, 15 L. Ed. 554.

The authority of the master to bind the vessel itself for supplies, etc., grew out of the necessities of maritime commerce, the business of the ship was to go on. If she found herself in a foreign port, where neither the owner nor master were known, or had individual credit, the right to pledge her for the wherewith to proceed was early recognized as a necessity, and for that reason a lien was accorded him whose labor or capital enabled the vessel thus situated to accomplish the purpose of her being. In such a case the furnisher, in the absence of evidence showing that the supplies were not furnished on the credit of the vessel, was considered as contracting with the vessel herself. The Grapeshot, 9 Wall. (76 U. S.) 129, 19 L. Ed. 651; The Alligator (C. C. A. 3) 161 Fed. 37, 88 C. C. A. 201; The H. B. Foster, Fed. Cas. No. 6,291.

The act of June 23, 1910, extended said lien to domestic vessels, and made it unnecessary to allege or prove that credit for the supplies, etc., was given to it, but it did not obviate the necessity to allege and prove that said supplies were in fact furnished to the vessel. This does not mean that the materialman must personally see that the goods are actually put on the vessel. If the supplies are furnished on the orders of the person to whom its management has been lawfully intrusted at the port of supply, and which pursuant to the orders of such person were forwarded in the manner indicated to a designated place, from which they were taken by such person to the vessel where it was at work, such supplies are furnished to it within the meaning of the act of 1910. The Yankee (C. C. A. 3) 233 Fed. 919, 147 C. C. A. 593.

Nor did this act change the law that a lien does not exist when the supplies are furnished on the mere credit of the owner. Ely v. Murray & Tregurtha Co. (C. C. A. 1) 200 Fed. 369, 118 C. C. A. 520. The agreement or understanding as to whether credit was given to the vessel, or the owner alone, may be inferred from acts and circumstances as well as from express language. Cuddy v. Clement (C. C. A. 1) 115 Fed. 301, 53 C. C. A. 94; The Lucille (D. C.) 208 Fed. 424.

No case has been cited, and none has been found, where a maritime lien has been allowed, where the supplies were furnished on the order of the owner, which did not indicate that they were for a vessel's use, because the goods or some of them were subsequently used on said vessel. There are cases which sustain such a lien where the goods or services were ordered for several vessels, and all of the goods or labor were actually furnished or rendered to said vessels. The Kiersage, Fed. Cas. No. 7,762; The Murphy Tugs (D. C.) 28 Fed. 429; McRae v. Bowers Dredging Co. (C. C.) 86 Fed. 344; The Yankee (Claim of the Glen Brook Coal Co.), supra. In these cases the value of the supplies and services was proportioned and liens allowed on said vessels respectively.

The difference between those cases and the instant one is radical. In those the supplies were furnished or the services rendered to the vessels on orders so to do. In the case at bar the goods were ordered by the general manager of the Fertilizer Company without mention that they were intended for use on a vessel. They were not delivered or

consigned to any vessel by the furnishers, but to the owner, as had been the practice for years.

In the case of coal, food, and culinary supplies, these were stored by the owner at its factory. Their arrival there was not a mere arrest or stoppage in transitu, but, so far as their delivery is concerned, they had reached their final destination. If the goods are furnished to the vessel in good faith, the materialman is not answerable for their misapplication. The H. B. Foster, supra. If not furnished to the vessel, their subsequent use thereon will not create a lien, as the furnisher's right to a lien arises, if at all, from what occurred at the time the supplies were ordered or furnished, not from what may have been subsequently done in regard thereto.

It was not because the vessel was away from her supply port and under necessity of immediate provisioning that any of these goods were ordered or furnished. They were ordered on the owner's general order to be held in store for use at its convenience, as its business should subsquently require.

In the case of the scine and parts of the fishing tackle furnished by the Thread Company, these articles, from their very character, as before noted, carry the intelligence that they were probably for use on a fishing boat. Does this distinction entitle them to a lien? On the hearing I was rather impressed that it did, but further reflection has convinced me that the distinction is not controlling.

The evidence establishes that in the sale of these goods, as well as in the sale of the goods embraced in the King and Coal Company's libels, none of these libelants considered this steamer, or any other vessel for that matter, as a factor in accepting the orders or in the delivery of said supplies, but that the Fertilizer Company, one of their old and up to that time reliable customers, alone was considered in those transactions, and that said commodities were furnished to it, and it alone, and on its sole credit. The claim of the Thread Company for parts of fishing tackle is similar to that of Atwood's for a "net-lifter," denied a lien in The Bethulia (D. C.) 200 Fed. 877. This net-lifter was for use on a fishing vessel. It was purchased by the Boston Fisheries Company, the owners of the Bethulia, and on the order of Atwood was forwarded to it direct from the manufacturers. This machine was subsequently installed on said vessel. The owners of that vesssel had previously purchased a machine from Atwood, which it used on another of the company's vessels. The district court in that case laid stress on the facts that this lifter had not been ordered specifically for the Bethulia, nor delivered to that particular vessel.

[2] By the general maritime law before the act of 1910, when supplies were ordered for a vessel by the owner, in the absence of evidence showing that they were furnished on the credit of the vessel, the presumption was that they were sold on the credit of the owner, and a lien was denied. The St. Jago de Cuba, 9 Wheat. (22 U. S.) 409, 416, 417, 6 L. Ed. 122; The Valencia, 165 U. S. 264, 271, 17 Sup. Ct. 323, 41 L. Ed. 710; Prince v. Ogdensburg Transit Co. (C. C.) 107 Fed. 978; New York Trust Co. v. Bermuda-Atlantic S. S. Co. (D. C.) 211 Fed. 989, 999. For other cases, see note 46, 26 Cyc. 778. By this act, when the supplies are furnished to the vessel on the order of the owner or

his authorized agent, this presumption is nullified, and a prima facie lien is given. When, however, as in the instant case, the evidence discloses that no vessel was mentioned in the ordering, shipping, or billing of the goods; that they did not reach the libeled vessel as a part of the transportation begun by the vendor; that the circumstances attending said furnishing in no respect differed from the course of dealing between these libelants and the Fertilizer Company carried on for many years; that the said company was carrying on a business in which vessels were but one kind or class of instrumentalities used in its promotion; that at no time was a vessel named as the recipient of said supplies by either said company or the shipper, and that the vendor had theretofore always looked to that company for payment—the furnishing of the supplies embraced in these libels must be held to be common-law sales and deliveries, made on the sole credit of the vendor, and not maritime contracts, for which a lien is given by the act of 1910.

The exceptions are sustained, and the libels of the Pennsylvania Coal & Coke Company, Wm. King & Co., and the Linen Thread Company are dismissed, with costs.

[3, 4] As to the contention of Wm. King & Co. that the Pusey & Jones Company and some of the other libelants cannot have a lien for repairs, etc., made before the year 1915, it is sufficient to say, first, that laches is not raised by the pleadings; and, second, that, as the proceeds of the sale of this steamer are insufficient to pay the uncontested liens, such a challenge can be made only by one who has a maritime lien on said vessel.