THE SOUTH COAST.*

(Circuit Court of Appeals, Ninth Circuit. October 1, 1917.)

No. 2865.

1. MARITIME LIENS ☞28—REPAIRS AND SUPPLIES—FEDERAL STATUTE.

Under the general maritime law the necessity for credit for repairs or supplies furnished to a vessel is presumed, when it appears that they were necessary and they were ordered by the master, and under Act June 23, 1910, c. 373, §§ 2, 3, 36 Stat. 604, 605 (Comp. St. 1916, §§ 7784, 7785), which are not intended to change this rule, the authority of the master to represent the owner in procuring repairs or supplies is also presumed, and these presumptions must prevail, unless it is shown that the master did not represent the owner, or was not authorized to use the credit of the vessel, and that the furnisher knew or ought to have known that fact.

2. MARITIME LIENS ☞21—SUPPLIES—AUTHORITY OF CHARTERER.

A charterer of the hull of a ship, with an option to purchase, the owner reserving the right only to appoint the master, who was to be paid by and to be under the orders of the charterer, provided that the owner might retake the vessel on failure of the charterer to pay the charter hire, or to discharge any liens within 30 days, and that the charterer should hold the owner harmless from all liens or demands against the vessel created during the charter term. *Held*, that such provisions did not negative the authority of the charterer to procure supplies on the credit of the vessel, but rather implied such authority, and that one who in good faith furnished necessary supplies on the order of the master and expressly on the credit of the vessel, although notified by the owner not to do so, was entitled to a lien therefor.

Appeal from the District Court of the United States for the First Division of the Northern District of California; Maurice T. Dooling, Judge.

Suit in admiralty by J. C. Rudbach against the steamer South Coast, the South Coast Steamship Company, Claimant. Decree for libelant, and claimant appeals. Affirmed.

For opinion below, see 233 Fed. 327.

On June 19, 1915, the South Coast Steamship Company chartered to Howard R. Levick, Jr., with the right of purchase, the steam schooner South Coast, on terms and conditions set forth in the charter party, which contains, among others, the following provisions:

"Fifth. It is understood that this charter is a charter of the bare vessel, and that said party of the second part shall furnish the crew, pay their wages, victual them, furnish all deck and engine room and saloon stores and supplies of every kind and nature, pay for all fuel, fresh water, port charges, wharfages, customs charges, customs fines, or government fines, pilotages, overtime of crew, agencies, commissions, consular charges, dry-docking, paint-ing of the hull of said vessel, furnishing all·lines and slings, and pay all other charges whatsoever of every nature, whether of the same kind as hereinabove enumerated or otherwise, that may be incurred in or about the use of said vessel during the term of this charter."

By the sixth paragraph the owner is accorded the right to appoint the master, who is to be under the orders of the charterer as to the management of the ship, and whose wages are to be paid by the charterer.

By the eighth paragraph, in default of any payment, or upon failure on the part of the charterer, within 30 days after incurring the same, to discharge any debts or liabilities which are liens on the vessel, the owner is given the right to withdraw the vessel from the service of the charterer.

By the tenth paragraph it is provided that, if the payments (charter hire)

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Rehearing denied January 7, 1918.

are not made, then, at the option of the owner, the vessel shall be delivered to it, "free from all liens and claims of every kind or description whatsoever during the term of this charter party, except the lien for any salvage services that may be rendered to said vessel, and that he, the said party of the second part, will hold and save harmless the said party of the first part from all liens, claims, or demands upon or against the said vessel that may be preferred against the said party of the first part or against the said vessel, and arising or created during the term of this charter party, except any claim for salvage services that may be rendered to said vessel, and further will save said party of the first part harmless from all liens, losses, damages, costs, or expenses that said party of the first part may sustain or be put to in consequence of such liens, claims, or demands, or in respect to any litigation arising out of or in respect thereto or connected therewith."

As to the further facts, we adopt the statement of the trial court, as follows:

"Libelant furnished supplies at various times to the steamer South Coast in the harbor of San Pedro, each time on the order of the person then her master. The vessel was, during this period, being operated by one Levick under a charter from the owners, which charter was also in the nature of a conditional bill of sale, or option to purchase. Libelant, before furnishing any of the supplies in question, was informed that the vessel was under charter to Levick and had been warned by the owners of the vessel not to have any bills go on the ship's account, and had also been advised that Levick and Oliver would pay the bills. To this he replied that it was immaterial to him who paid the bills, but that he would not sell any goods to the ship in any other way than by charging them to the ship and her owners, and if they did not want it that way he would not deliver any goods. This was stated by him to one Mills, who first informed him that Levick was operating the ship, and who had been directed by the owners to give him warning not to sell on the credit of the ship. He was also warned by Mr. Sooy, one of the owners, not to deliver any goods on the credit of the ship. So that if the owners, after the delivery of the ship to the charterers, had any power to prevent the attaching of a lien for supplies by warning the libelant not to furnish such supplies on the credit of the ship, such warning was clearly and definitely given."

Marcel E. Cerf and C. H. Sooy, both of San Francisco, Cal., for appellant.

Ira S. Lillick, of San Francisco, Cal., for appellee.

Before GILBERT and HUNT, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge (after stating the facts as above). [1] Prior to the adoption of the act of Congress of June 23, 1910 (36 Stat. 604), relating to liens upon vessels for repairs, supplies, or other necessaries, there was much confusion respecting the law, as to whether a lien would attach where the necessaries and supplies, etc., were ordered by the master when the owner was personally present, or whether such a lien was susceptible of being impressed orally by the owner in case the supplies, etc., were furnished through his personal order on the credit of the ship. In the first instance, it was thought that it would not attach because, the owner being present, the presumption seemed to prevail that there was want of authority in the master to bind the vessel. But, if the ship were in a foreign port and the owner were not present, the authority of the master to bind the ship would exist through necessity, that the ship might be repaired and provisioned in order to go forward upon its voyage. Thomas et al. v. Osborn,

19 How. 22, 15 L. Ed. 534; The Kalorama, 10 Wall. 204, 212, 213, 19 L. Ed. 941; The Underwriter (D. C.) 119 Fed. 713, 755.

In the second instance, according to many authorities, the personal order of the owner gave rise to the presumption that the supplies were furnished on his personal credit. The St. Jago de Cuba, 9 Wheat. 409, 6 L. Ed. 122. And it was not even clear that the owner could impose a lien upon the vessel by oral agreement. The Iris, 100 Fed. 104, 40 C. C. A. 301; Cuddy v. Clement, 113 Fed. 454, 51 C. C. A. 288. But all this controversy has been put at rest, or rather obviated, by the statute, which imposes a lien in favor of the person furnishing repairs, supplies, etc., "upon the order of the owner or owners, * * * or of a person by him or them authorized." Section 1 (Comp. St. 1916, § 7783). The lien follows, therefore, in any event, where the repairs or supplies are furnished by direction of the owner, though by the fourth section of the act (section 7786) it may be waived on the part of the furnisher of such repairs, supplies, etc., by agreement or otherwise. By the second section (section 7784) the master, among others, is presumed to have authority from the owner to procure repairs, etc., and by the third (section 7785), the presumption is declared to extend to such officers and agents "when appointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel." So that one who disputes the validity of a supposed lien claimed for repairs, etc., furnished on the order of the master, is required to overcome the presumption which the law imposes of the master's authority to represent the owner respecting the particular involved. In other words, the presumption imposed by the statute is disputable in character, and it has been held that it is but declaratory of a principle previously recognized in maritime jurisprudence. The Yankee, 233 Fed. 919, 147 C. C. A. 593.

There is a divergence of opinion among the cases as to whether a charter party of the nature and character of the one here involved withdraws the authority of the master to act for the owner in the ordering of repairs, supplies, etc. Judge Lowell has held, in a most learned and searching opinion, that it does. The Underwriter, supra. But this decision is disapproved by the Circuit Court of Appeals of his circuit in the case of The Surprise, 129 Fed. 873, 64 C. C. A. 309, which impresses us as being based upon the stronger reasoning. The court there says:

"We should also observe that much has been made of the fact that, in The Kate and The Valencia, there were formal charter parties which expressly provided that each charterer should disburse the vessel for ordinary current expenses and protect her from all liens on account thereof. There seems to be an impression that there was something in this fact of special importance, and it has apparently appealed to the legal imagination. It was, however, absolutely immaterial, because, on every charter of the hull of a vessel, the substantial relations of the parties are the same as those specially provided in The Kate and The Valencia. The charterer is bound to disburse the vessel and protect her from liens, and impliedly agrees to do so, an agreement as effectual in law as an express one. Moreover, so far as concerns knowledge on the part of a merchant of a charter party or its terms, or the duty arising on a merchant to inquire, there is no essential distinction; because, if a merchant knows that the hull is chartered, though orally and informally, he knows as a matter of course, and must be held to know, that

the usual obligations pro and con exist, and he could know no more if the whole was expressed in a formal instrument. We emphasize this fact, because all the decisions we will hereafter cite, relating to vessels where the hull was chartered, bear on The Kate and The Valencia, regardless of the fact whether there was a formal charter, or only an oral one without any express statement of the terms thereof" (citing thereafter numerous cases).

In Thomas et al. v. Osborn, supra, Mr. Justice Curtis has this to say:

"Nor do we think the fact that the master was charterer and owner pro hac vice necessarily deprived him of this power [the power to borrow money on the credit of the vessel for repairs and supplies]. It is true it does not exist in a place where the owner is present. The St. Jago de Cuba, 9 Wheat. 409 [6 L. Ed. 122]. But this doctrine cannot be safely extended to the case of an owner pro hac vice in command of the vessel. Practically this special ownership leaves the enterprise subject to the same necessities as if the master were master merely, and not charterer, and the maritime law gives him the same power to borrow to meet that necessity as if he were not charterer."

A little later the eminent jurist reaches this conclusion:

"And so in this case, we think, the general owners must be taken to have consented that, if a case of necessity should arise in the course of any voyages which the master was carrying on for the joint benefit of themselves and himself, he might obtain, on the credit of the vessel, such supplies and repairs as should be needful to enable him to continue the joint adventure. This presumption of consent by the general owner is entertained by the law from the actual circumstances of the case, and from considerations of the convenience and necessities of the commercial world."

It seems to be settled law that, unless repairs and supplies are necessary to render the vessel seaworthy to enable her to proceed on her voyage, the master is not authorized, as between himself and the owners, to procure them on the credit either of the owners or of the vessel. But the necessity for credit will be presumed where it appears that the repairs and supplies were ordered by the master, and that they were then necessary for the ship when lying in port, or to fit her for an intended voyage, unless it be shown that the master had funds, or that the owners had sufficient credit, and that the repairer, furnisher, or lender knew those facts, or one of them, or that such facts and circumstances were known to him as were sufficient to put him upon inquiry, and to show that if he had used due diligence he would have ascertained that the master was not authorized to obtain any such relief upon the credit of the vessel. The Lulu, 10 Wall. 192, 203, 19 L. Ed. 906; The Kalorama, supra. This latter case added the element of good faith, on the part of the parties concerned, in the procuring and furnishing of such repairs and supplies.

In the case of The Kate, 164 U. S. 458, 469, 17 Sup. Ct. 135, 140 (41 L. Ed. 512), the court says:

"The principle would seem to be firmly established that, when it is sought to create a lien upon a vessel for supplies furnished upon the order of the master, the libel will be dismissed if it satisfactorily appears that the libelant knew, or ought reasonably to be charged with knowledge, that there was no necessity for obtaining the supplies, or, if they were ordered on the credit of the vessel, that the master had, at the time, in his hands, funds which his duty required that he should apply in the purchase of needed supplies. Courts of admiralty will not recognize and enforce a lien upon a vessel when the transaction upon which the claim rests originated in the fraud of the master

upon the owner, or in some breach of the master's duty to the owner, of which the libelant had knowledge, or in respect of which he closed his eyes, without inquiry as to the facts."

Based upon the principle, the following deduction was made:

"If no lien exists under the maritime law, when supplies are furnished to a vessel upon the order of the master, under circumstances charging the party furnishing them with knowledge that the master cannot rightfully, as against the owner, pledge the credit of the vessel for such supplies, much less is one recognized under that law where the supplies are furnished, not upon the order of the master, but upon that of the charterer who did not represent the owner in the business of the vessel, but who, as the claimant knew, or by reasonable diligence could have ascertained, had agreed himself to provide and pay for such supplies, and could not, therefore, rightfully pledge the credit of the vessel for them."

See, also, The Valencia, 165 U. S. 264, 17 Sup. Ct. 323, 41 L. Ed. 710.

It would appear, in view of these authorities, that the clause in the act of Congress (section 3 [Comp. St. 1916, § 7785]) declaring that nothing contained therein "shall be construed to confer a lien when the furnisher knew, or by the exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor," was intended as declarative of maritime law respecting the subject, as it existed prior to the enactment. It was not designed to ordain any new or different principle of law. So that, under the law, the necessity for credit is presumed when it appears that the repairs, supplies, etc., were necessary and were ordered by the master; and, under the act, the authority of the master to represent the owner in procuring such repairs, etc., is also presumed. And these presumptions must prevail, unless it be shown that the master did not represent the owner, or was not authorized to obtain any such relief on the credit of the vessel, and the furnisher knew or ought to have known the fact. This we take to be the rule, in view of the statute, read in the light of the law applicable as it existed previous to its enactment.

[2] Now, coming to the instant controversy: The repairs and supplies in question were furnished on the order of the master. The master, who was appointed by the owner, was obliged, under the charter party, to take his directions from the charterer. The libelant was apprised of the existence of the charter party, and was warned by the owner not to furnish supplies on the ship's credit. The libelant, nevertheless, furnished the supplies, with the declaration to the owner's representative that he would not furnish them in any other way, or under any other conditions, than upon the credit of the ship.

It is the purpose of the statute, as it was the purpose of the law previous thereto, that the furnisher of such commodities as are necessary to enable a ship to enter upon or pursue her voyage, and to engage in maritime traffic, to which only she is adapted, shall have a lien on the ship therefor. It is in the interest of shipping, conducted upon maritime waters, that such should be the case, as otherwise credit would not be extended, upon the account of the owner or master alone, to

enable the ship to discharge its peculiar function, and great inconven-
ience would follow, to the detriment and disadvantage, if not the
ultimate disaster in large measure, of maritime shipping. Many ships
sail under charter, either verbal or in form of regularly drawn charter
parties, and it is usual and customary for the charterer in either event
to disburse the necessary expenses of the ship; and of this all persons
furnishing supplies, etc., to a chartered ship must be deemed to have
notice. But notwithstanding this notice, or even knowledge that the
ship is under charter, we cannot believe that it was the intendment of
the statute or of the law that the furnisher should, because of that
fact, be deprived of his lien when advancing necessary repairs or sup-
plies in good faith to enable the ship to engage in her accustomed
traffic. Nor do we believe that it was the intendment of the statute
or of the law thus to impose so vital a hindrance upon maritime ship-
ping, and unless there is something more in the charter party, that un-
alterably inhibits the master or the charterer from incurring any ex-
penditures on the credit of the ship that may become a lien thereon,
the master's ordinary authority is not impaired or abbreviated; nor
can the right of the furnisher of repairs, etc., to extend credit to the
ship, and his consequent lien, be so subverted.

The terms of the present charter party as respects the furnishing of
repairs, supplies, etc., are only those usual to most charter parties, and
by reason of the provision that the charterer will hold the owner harm-
less from all liens against the vessel, there is an implication of author-
ity on the part of the charterer to incur such expenses on the credit of
the vessel. True it is that the owner attempted to prevent the libelant
from advancing the supplies on the credit of the vessel; but this was
an invasion of the charterer's rights under the charter party, and was
unavailing to subvert the master's authority in the premises. As bear-
ing upon the proposition, in addition to The Surprise, supra, see The
Philadelphia, 75 Fed. 684, 21 C. C. A. 501.

Stress is laid upon The Kate and The Valencia, supra, as determina-
tive of the present controversy. In The Kate, the coal, for the price
of which the lien was filed, was furnished to the charterer under cir-
cumstances indicating, as was said in The Surprise, "that there never
was any expectation of holding the vessel," and, as explained by the
Supreme Court:

"None of the coal furnished to the chartered vessels was ordered by the
master of the vessel, nor were any of the bills therefor submitted to him
for approval. They were submitted only to the steamship company. Nor
did the agents of the chartered vessels know that coal was supplied by the
libelant on the credit of the vessel, or that any specifications of lien were
filed under the local statute."

In other words, the dealing respecting the coal was always directly
between the libelant and the steamship company, the charterer; the
vessel at the same time having an agent within easy communication of
the parties. The case practically hinged upon the condition that there
was an element of fraud in the transaction of claiming the lien, to
which the libelant was a party. The Valencia is an analogous case.
The present controversy is without any such element of fraud at-
tributable to the libelant. These cases of The Kate and The Valencia

are therefore without application, further than they purport to state general maritime law.

The decree of the District Court will be affirmed.