W. G. COYLE & CO., Inc., v. NORTH AMERICA STEAMSHIP CORPORA-
TION, Limited, et al.

THE YARMOUTH.

(Circuit Court of Appeals, Fifth Circuit. January 3, 1920.)

No. 3408.

1. MARITIME LIENS ⊜⇒29—FURNISHING COAL TO FOREIGN VESSEL UNDER CHAR-
   TER GAVE RIGHT TO LIEN.

   Libelant, who furnished coal in New Orleans to a foreign steamship un-
   der charter made in New York, and new in the port, on an order given at
   the request of a business associate of the charterer, who was absent,.
   but pursuant to a requisition of the chief engineer, and which coal was re-
   ceived and receipted for by the master, *held* entitled to a lien under Act.
   June 23, 1910, c. 373, §§ 1–3 (Comp. St. §§ 7783–7785), where it did not ap-
   pear that libelant could by the exercise of reasonable diligence have ascer-
   tained that by the terms of the charter the charterer was to furnish coal.

2. MARITIME LIENS ⊜⇒30—FURNISHER OF SUPPLIES NOT CHARGED WITH NOTICE.
   OF CHARTER.

   The mere fact that one furnishing coal to a vessel is informed that she
   is under charter is not enough to charge him with notice of the terms of
   the charter party.

3. MARITIME LIENS ⊜⇒29—LIEN FOR SUPPLIES FURNISHED TO FOREIGN VESSEL
   PURSUANT TO REQUISITION OF CHIEF ENGINEER.

   An order for coal delivered to a foreign steamship, pursuant to a req-
   uisition of the chief engineer, an appointee of the owner, where the
   coal is received by the master and engineer and receipted for by the
   former, is to be regarded as given by the ship's master within Act June
   23, 1910, c. 373, § 2 (Comp. St. § 7784), although a business associate of the
   charterer co-operated in procuring the giving of the order.

4. MARITIME LIENS ⊜⇒65—PRESUMPTION OF AUTHORITY OF MASTER TO PROCURE.
   SUPPLIES NOT OVERCOME BY SHOWING MADE.

   The statutory presumption that a master has authority from the
   owner to procure supplies or other necessaries for his vessel, under Act
   June 23, 1910, c. 373, § 2 (Comp. St. § 7784), is not rebutted or destroyed by
   showing merely that the furnisher was informed that the vessel was under
   charter.

Appeal from the District Court of the United States for the Eastern
District of Louisiana; Rufus E. Foster, Judge.

Suit in admiralty by W. G. Coyle & Co., Incorporated, against the
steamship Yarmouth; the North America Steamship Corporation,.
Limited, claimant. Decree for respondent, and libelant appeals. Re-
versed.

Gustave Lemle, Selim B. Lemle, and Arthur A. Moreno, all of New
Orleans, La. (A. A. Moreno and Lemle & Lemle, all of New Orleans,.
La., on the brief), for appellant.

Abraham Goldberg, H. Generes Dufour, and Alfred C. Kammer,
all of New Orleans, La. (Farrar, Goldberg & Dufour, of New Orleans,.
La., on the brief), for appellees.

Before WALKER, Circuit Judge, and GRUBB and ERVIN, Dis-
trict Judges.

WALKER, Circuit Judge. [1] This is an appeal from a decree dis-
missing a libel against the Yarmouth, a Canadian steamship, for

amounts claimed to be due for coal furnished and towage services ren-- dered by the libelant to that ship while it was in the port of New Or- leans in July, 1917.  The ship was released on a claim interposed by its owner, the appellee, a corporation of Nova Scotia.  The libelant (appellant here) was engaged in the coal business in New Orleans. Among its customers was the Cuyamel Fruit Company, which operated a number of steamers, to which the libelant furnished coal at prices previously agreed on.  It furnished coal to the Yarmouth under the following circumstances:  Herbert S. Hiller, who was traffic manager of the Cuyamel Fruit Company, was of good repute and was well known to the appellant, after getting from the latter quotations of prices of coal, ordered it to deliver to the Yarmouth 265 tons of Ala- bama steam coal at the price quoted.  The order was complied with by delivering the coal to the Yarmouth; its master and engineer having knowledge of such delivery, the former giving a receipt for the coal. A like order, given about a month before, had been complied with in the same way.  On his  direct examination as a witness for the libelant, Mr. Hiller testified to the effect that the coal was ordered and deliv- ered as above stated, and that he ascertained the price and gave the order at the request of G. B. Warden, who was associated in business with F. R. Betancourt, the charterer of the Yarmouth.  The follow- ing is a part of the report of the cross-examination of that witness:

"Q. Did Mr. Betancourt tell you to order coal for the steamship Yarmouth? A. Mr. Betancourt was out of town.  Mr. Warden left it entirely with me to order the coal for the ship.

"Q. When you ordered this coal from W. G. Coyle & Co., were any questions asked you as to whether or not the ship was under charter?  A. I believe it was asked who was operating the steamship.  It was a new steamer here in town, and they asked me some information about the boat, which I told them; that is what information I gave them.

"Q. What information did you give them?  A. I told them that the boat was chartered under the charter to F. R. Betancourt.

"Q. They asked no further questions?  A. Well, they just merely asked— they asked me if these people had an office.  I remember they asked me those particulars.

"Q. You say that the steamship Yarmouth was under charter for two months.  Do you know what months?  A. I think it was under charter for two months; that is my understanding.  I had nothing to do with the charter of the ship, nor did I see any records of the ship; but I do know that they told me the ship was under charter, and the managing owner of the ship ad- mitted that the boat was under charter.

"Q. But what I am trying to get you to answer is whether or not this par- ticular coal which you claim to have ordered was ordered during the time you know the ship to have been chartered to Betancourt and Warden?  A. To the best of my knowledge and belief, the boat was under charter at that time.

"Q. You testify that this coal was used for fuel of the steamship Yarmouth. How do you know that?  A. From a statement—

"Q. You do not know that of your own knowledge; you have no actual knowledge of it?  A. No; I was not on the ship.

"Q. When you ordered this coal, did you order any particular kind of coal? A. No; the usual custom is to order sufficient coal, according to the requisi- tion of the chief engineer of the boat.

"Q. And you were the one that agreed as to the price of the coal?  A. Yes, sir.

"Q. Do you know how much was delivered under your first order?  A. I kept no records of the delivery.

"Q. Do you know how much was delivered under the second order? A. It was 265 tons.

"Q. Did you keep a record of that delivery? A. No, sir.

"Q. Then how do you know it? A. I know it by the report from the captain and invoices.

"Q. But not of your own knowledge? A. Not of my own knowledge.

"Q. When was your first order given for the coal? Was it during the existence of this same charter? A. Yes, sir.

"Q. Do you remember how much was delivered then? A. I do not remember. I might say that, as far as the deliveries were concerned, I do not believe that, in the operation of any boat, the man that purchases the coal knows how much goes on the ship actually, because we never see the coal go in the ship, and we only go by the records received from the chief engineers.

"Q. The first coal was bought or ordered from W. G. Coyle & Co. under the same conditions and circumstances as the second coal, was it not? A. The same; yes, sir.

"Q. Did you have anything else to do with Betancourt, or Warden, or F. R. Betancourt, in ordering these supplies? I mean by that, did you have anything to do with other officers, the payment of bills, or anything like that? A. Not a thing."

Following the delivery of the coal and the rendition of towage services, the libelant made out a bill therefor against "S. S. Yarmouth and Owners," which it sent to Mr. Hiller. Mr. Hiller referred the collector to Betancourt & Co., who had an office in New Orleans, as he had done in the case of a similar bill for the coal delivered to the Yarmouth about a month before. Betancourt & Co. paid the first bill, but did not pay the second one. Evidence adduced showed that at the time of the transactions in question the Yarmouth was being operated under a charter party made in New York on the 4th day of June, 1917, by the owner, the appellee, to Fiacro R. Betancourt. By that instrument the owner hired the ship for the period of two months from the 5th day of June, 1917, "with full complement of officers, seamen, engineers, and firemen for a vessel of her tonnage." It contained the following provisions:

"That the owner shall provide and pay for all provisions, wages of captain, officers, marine insurance, firemen and crew; shall pay for the hull insurance of the vessel; also for all cabin, deck, engine room, and other necessary stores, and keep the steamer in a thoroughly efficient state in hull, machinery, and equipment for and during the service.

"(2) That the charterer shall provide and pay for all the coal, port charges, pilotages, agencies, commissions, consular charges (except those pertaining to the captain, officers, or crew), and all other usual expenses, except those aforestated; but when the vessel puts into a port for causes for which the steamer is responsible, then all such charges shall be paid by the owner."

So far as was disclosed, at the time of the transactions in question, the libelant was without information as to the Yarmouth and how it was being operated, except as shown by the above set out part of the testimony of the witness Hiller.

[1] So far as the claim against the ship for the price of the coal furnished is concerned, the decree appealed from is sought to be sustained on the ground that evidence adduced was such as to support a finding that the libelant was informed that the ship was operated by a charterer, and by the exercise of reasonable diligence could have ascertained that, because of the terms of the charter party, the person order-

ing the coal was without authority to bind the vessel therefor. The provision in the charter party requiring the charterer to provide and pay for coal would, under the proviso contained in section 3 of the "Act relating to liens on vessels for repairs, supplies or other necessaries" (36 Stat. 604, c. 373 [Comp. St. § 7785]), prevent that act from having the effect of giving a lien on the ship for coal furnished on the order of the charterer, if the furnisher knew, or by the exercise of reasonable diligence could have ascertained, the terms of the charter party. The Kate, 164 U. S. 458, 17 Sup. Ct. 135, 41 L. Ed. 512; The Valencia, 165 U. S. 264, 17 Sup. Ct. 323, 41 L. Ed. 710.

There are material differences between the facts of each of the two cases just referred to and those of the instant case. Each of those decisions was rendered in responding to questions certified to the Supreme Court by a Circuit Court of Appeals. In the first-cited case the following facts were disclosed:

"On the order of a steamship company, which had an agent and office in New York City, the libelant, which had a place of business in the same city, furnished and delivered coal to vessels at that place, which were operated by the steamship company, under charters requiring the charterer to pay for coal furnished to the vessels.

"The owners of each chartered vessel, as the libelant knew, had an agent for the business of the vessel at New York City. The libelant knew or could easily have known what vessels belonged to the steamship company and what vessels were operated by the latter under time charters. It is true that its agents did not examine the charter parties, nor make any inquiry as to their provisions; but from what they had always heard about such instruments they believed and assumed, or took it for granted, that they contained conditions requiring the charterers, at their own expense, to provide and pay for all coals needed by the vessel. It was under these circumstances that the libelant furnished each vessel, operated by the steamship company, with coal as ordered by that company, charging the company and the vessel therefor, without making any distinction in the mode of keeping its accounts between the vessels owned by the steamship company and those operated by it under time charter parties. Specifications of lien were filed in the proper office against each vessel to which coal was delivered.

"None of the coal furnished to the chartered vessels was ordered by the master of the vessel, nor were any of the bills therefor submitted to him for approval. They were submitted only to the steamship company. Nor did the agents of the chartered vessels know that coal was supplied by the libelant on the credit of the vessel, or that any specifications of lien were filed under the local statute."

It was on the above-indicated state of facts that the court decided that the furnisher of the coal was chargeable with knowledge of the charterer's lack of authority to bind the vessel for the price of the coal furnished. The opinion in that case contained the following:

"If the libelant in this case had furnished the coal upon the order of the master, and without knowledge or notice that the vessel was operated under a charter party, or if coal had been furnished upon the order of the charterer as well as upon the credit of the vessel, under circumstances which did not charge libelant with knowledge of the terms of the charter party, but charged it only with knowledge of the fact that the vessel was being operated under a charter party, a different question would be presented."

The just-quoted statement makes it plain that that decision furnishes no support for the proposition that, without regard to other attending circumstances, the single fact that the furnisher of supplies to a vessel

is informed that it is under charter to the party on whose order the supplies are furnished charges such furnisher with notice of the terms of the charter party.

The Valencia, supra, also was a case of furnishing coal to a vessel at New York, not by the order or procurement of the master but on the order of a steamship company which had an office in that city, at which the furnisher did business with the steamship company, and the former could easily have ascertained the ownership of the vessel and the relation of the steamship company to the owners. Upon the facts certified, the court concluded that the libelant by reasonable diligence could have ascertained that the steamship company did not own the vessel, but used it under a charter party providing that the charterer should pay for all coal needed. In each of the cases cited there was a finding supported by facts disclosed, that the libelant, who had notice of the fact that the party giving the order was the charterer, would have learned of the terms of the charter party, if he had made use of sources of information shown to be accessible to him. The propriety of a decision that one is chargeable with notice of a fact actually unknown to him is dependent upon the circumstances under which he was put on inquiry.

The libelant in the instant case, on an order given by a well and favorably known official of a ship-operating company with which the libelant had business relations, furnished coal to a foreign vessel at New Orleans, that vessel being "a new steamer" there, about which no information was imparted to the libelant, other than that it was under charter to F. R. Betancourt, who, so far as appears, was a total stranger to the libelant, and was not in New Orleans when the coal was ordered and furnished. It was not disclosed that a charter party or a copy of it was in New Orleans, or that any one then at or near that place then knew what the terms of that instrument were. Evidently Mr. Hiller did not know what were the terms of the charter party. It was not shown that the libelant by reasonable diligence could have ascertained that the charter party to Betancourt provided that he should pay for all coal needed. One who is put on inquiry by a fact or circumstance coming to his notice is not properly chargeable with knowledge of another fact actually unknown to him, in the absence of a showing that the existence of such unknown fact would have been disclosed if the suggested inquiry had been made with due diligence. In the absence of a showing that one, before acting in a situation presented, had reasonably available means of learning of the existence of a fact actually unknown to him, he is not to be held to have been bound to know that fact, though he was put on inquiry.

[2] The mere fact that one knows or is informed that a ship is under charter is not enough to charge him with notice of the terms of the charter party. The George Dumois, 68 Fed. 926, 15 C. C. A. 675. In the case just cited the claim was for coal furnished to a ship in a foreign port on an order given by one known to be the charterer of it. The coal was received by the master and officers of the ship, was a necessary supply to the ship, without which the voyage could not have been prosecuted, and was used by the ship in prosecuting the voy-

age. That case arose and was decided before the enactment of the above-mentioned act of June 23, 1910, relating to liens on vessels for repairs, etc. It was held that under the law as it then existed a lien on the ship resulted from the furnishing of supplies under the circumstances stated, unless it was shown that the furnisher relied on the credit of the owner or charterer, not of the ship, and that, though the furnisher knew that the order for the coal was given by the charterer, he was not bound to know the terms of the charter party, which in fact included a provision requiring the charterer to pay for such supplies. If there had been no change in the law, that decision would be an authority supporting a ruling in the instant case that the furnishing of coal by the libelant was under such circumstances as to have the effect of creating a lien on the ship.

[3] While the evidence showed that Mr. Hiller, in giving the order for the coal, did so at the request of a business associate of the charterer, it also showed that when he gave the order he was apprised of the amount of coal needed by a requisition of the ship's engineer, an appointee of the owner, and that the master and the engineer acquiesced in the delivery of the coal to the ship; the former giving a receipt for it. An order so given is to be regarded as given by the ship's master, though a business associate of the charterer co-operated in procuring the giving of it. The Philadelphia, 75 Fed. 684, 21 C. C. A. 501; Norwegian Steamship Co. v. Washington, 57 Fed. 224, 6 C. C. A. 313; In re Alaska Fishing & Development Co. (D. C.) 167 Fed. 875.

The necessity, existing under the law as it formerly was, of alleging and proving that necessary supplies furnished on such an order as the one shown in the instant case were furnished on the credit of the vessel, is dispensed with by the provision of the above referred to act of June 23, 1910, that designated persons, including a ship's master, "shall be presumed to have authority from the owner or owners to procure repairs, supplies, and other necessaries for the vessel." This provision is qualified by the following one contained in section 3 of the act:

"But nothing in this act shall be construed to confer a lien when the furnisher knew, or by the exercise of reasonable diligence could have ascertained, that because of the terms of the charter party, agreement for the sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor."

Language used in the last-quoted provision, "nothing in this act shall be construed to *confer* a lien," etc., is some indication of the absence of an intention to deprive a furnisher of a lien on a ship for necessary supplies furnished to it under such circumstances that he would have had a lien under the previously existing law, unaffected by any lien statute. It is questionable whether the same meaning properly can be attributed to the proviso that it would have had if, instead of the last-quoted language, it had used some such language as the following:

"But the furnisher shall not have a lien if he knew, or by the exercise of reasonable diligence," etc.

If the transaction now in question had occurred before the enactment of the act mentioned, as it was a furnishing on the order of the

master of necessary supplies to a ship in a foreign port, there would have been a lien on the ship, unless it had been shown that the supplies were not furnished on its credit, or that the libelant knew, or by the exercise of reasonable diligence could have ascertained, that the master was without authority to bind the vessel therefor, and the circumstance that the libelant knew that the ship was under charter would not have been enough to rebut the presumption that the supplies were obtained on its credit, though the charterer participated in the ordering of them, and the charter party required the charterer to pay for them. The George Dumois, supra. As the libelant would have had a lien if the statute had not been enacted, there is some ground for saying that language used in the statute stands in the way of its being given the effect of preventing a lien in the libelant's favor attaching.

But, assuming that the statute has the effect of preventing the furnishing of necessary supplies to a vessel in a foreign port giving a lien on it, if a lien would not have resulted if the transaction had been in the vessel's home port, it is plain that an effect of the statute is to either create or recognize a presumption of the validity of such an order as the one on which the libelant furnished the coal, and that proof of the giving of that order and of compliance with it by delivering the coal to the ship with its master's acquiescence was prima facie sufficient to entitle the libelant to the lien claimed, and put upon the claimant the burden of proving that the master was without authority to bind the vessel, and that the libelant knew, or by the exercise of reasonable diligence could have known, of such lack of authority. The Yankee, 233 Fed. 919, 147 C. C. A. 593.

[4] Nothing in the act indicates that the presumption of authority in a vessel's master to procure necessaries for it could be rebutted or destroyed by showing that the furnisher knew or was informed that the vessel was under charter. To rebut or overcome the presumption of the master's authority to bind the vessel, it must be shown that the furnisher knew, or by the exercise of reasonable diligence could have ascertained, that the terms of a charter party, or something else, deprived the master of authority to bind the vessel for necessaries furnished to it. The burden was on the appellee, the claimant, to prove that the libelant knew, or by the exercise of reasonable diligence could have ascertained, that the charter party required the charterer to pay for coal needed. There was an absence of evidence tending to prove that the libelant either knew, or from any accessible source of information could have learned, that the charter party contained a provision having that effect. There was no evidence tending to prove that either the charter party or any one having knowledge of its terms was within reach of the libelant. It was not shown where the charterer was, except that he was not in New Orleans. To say that the libelant could have learned of the terms of the charter party by applying to the charterer's business associate, who was instrumental in procuring the giving of the order for the coal, would be a guess or surmise unsupported by evidence. We conclude that the order for the coal was given under such circumstances that it is to be treated as having been given by the master, and that

no evidence adduced rebutted or destroyed the statutory presumption that the master had authority to bind the vessel for the coal furnished on that order. It follows that the libelant was entitled to a lien for the price of the coal.

The evidence showed that the towage services in question were required in getting the coal ordered loaded on the vessel, and in effecting a needed movement of the vessel, and that they were rendered at the request or with the acquiescence of the master. The rendition of those services well may be regarded as necessary to enable the vessel to proceed on her voyage, or, at any rate, that they were such as facilitated its use as an instrument of navigation. We think such services were "necessaries," within the meaning of that word as used in the above-mentioned act of June 30, 1910, and that they were rendered under such circumstances as to give rise to a lien on the vessel for the price or reasonable value thereof.

The decree appealed from is reversed, and the cause is remanded, with instructions to enter a decree for the libelant for the amount claimed in the libel and costs.

Reversed.