THE ST. JOHNS.

COLONIAL BEACH CO. v. QUEMAHONING COAL CO., Inc., et al.

(Circuit Court of Appeals, Fourth Circuit. May 12, 1921.)

No. 1866.

Maritime liens ☞30—Furnisher of supplies not bound to inquire as to ownership of vessel.

A supply man, who knows nothing about a ship other than that it is a ship in possession of those who order supplies for . her, may furnish them on her credit, and is not bound, under Act June 23, 1910, § 3 (Comp. St. § 7785), to make further inquiry, to be entitled to a lien therefor.

Woods, Circuit Judge, dissenting.

Appeals from the District Court of the United States for the Eastern District of Virginia, at Alexandria; Edmund Waddill, Jr., Judge.

Suits in admiralty by the Quemahoning Coal Company, Inc., and Coale & Co. against the Steamer St. Johns; the Colonial Beach Company, owner and claimant. Decrees for libelants, and claimant appeals. Affirmed.

Hugh H. Obear and Fred N. Oliver, both of Washington, D. C. (Paul Dulaney and Douglas, Obear & Douglas, all of Washington, D. C., on the brief), for appellant.

Richard E. Preece, of Baltimore, Md. (Frank E. Welsh, Jr., of Baltimore, Md., on the brief), for appellees.

Before KNAPP and WOODS, Circuit Judges, and ROSE, District Judge.

ROSE, District Judge. The Quemahoning Coal Company, Incorporated, and Coale & Co., referred to herein as the "supply men," libeled the steamer St. John, belonging to the Colonial Beach Company, called the "owner," for the price of sundry lots of bunker coals furnished the

---

steamer upon the order of the person intrusted with her management at the port of supply, by the Baltimore & Southern Navigation Company, styled the "charterer," then in possession of her, under a written agreement primarily of conditional sale, but which, in certain contingencies, was to be considered as a charter party, and by which the charterer promised not to incur any debts upon the credit of the steamer.

It was in contemplation of both parties to the contract that the charterer should operate the vessel, and it was expressly provided that all proceeds from its operation should be applied first and immediately towards liquidating all operating expenses, pier rentals, necessary office expenses incident to the management of the vessel, and all debts and liabilities which would be a lien on the vessel; such debts and liabilities to be discharged in full as they arose, before the operating receipts were to be used for any other purpose.

The charterer specifically promised not to incur any debts upon the credit of the vessel, and as required by the agreement deposited $10,-000 with a trust company to protect the owner against the consequence of any breach of its engagements, and subsequently, within the four months during which the vessel was in its possession, paid $45,000 on account of her purchase price of $90,000. Upon the failure of the charterer to make further payment, the owner repossessed itself of the ship, and held both the sums mentioned, aggregating $55,000, as charter hire; something which the terms of the contract authorized it to do.

Nobody told Coale & Co., one of the supply men, that the person intrusted with the management of the St. John at the port of supply, was appointed by the charterer, and not by the owner, and Coale & Co. never asked any questions on the subject. The owner says that, in refraining from inquiry, Coale & Co. failed to exercise the reasonable diligence required by the proviso to the third section of the act of 1910 (Comp. St. § 7785). The Circuit Courts of Appeal for the Second, the Third, the Fifth, and the Ninth Circuits have held the law to be otherwise. The Oceana, 244 Fed. 80, 156 C. C. A. 508; The Yankee, 233 Fed. 926, 142 C. C. A. 593; The Yarmouth, 262 Fed. 254; The South Coast, 247 Fed. 89, 159 C. C. A. 302.

We are of like mind. A supply man who knows nothing about a ship, other than it is a ship in possession of those who order supplies for her, may furnish them upon her credit, without making further inquiry, taking the chance—usually a remote one—that the possession of her was tortiously acquired.

It is said that, whatever be true as to Coale & Co., the Quemahoning Coal Company, Inc., the other supply man, had been told that the ship was under charter. A witness so swears, but he is flatly contradicted by the agent of the supply man to whom he says he gave the warning. Both men testified in the presence of the learned judge below. It may be he believed the one produced by the supply man rather than the other, who testified for the owner. As, however, he filed no opinion, it is possible that he may have based his decision in

favor of the supply man upon other grounds. From our own examination of the record, we are persuaded that the version given by the agent of Coale & Co. is by far the more probable.

The greater part of the coal was furnished in November, 1919. At that time those who had coal were sought by those who had need of it. They had no occasion to look for customers. It is scarcely conceivable that, under such conditions, the supply man would have knowingly bartered his coal for a lawsuit.

It is easy to see how the vice president and manager of the charterer, who testified that he gave the information, may have been mistaken. He, at least in form, held the same positions contemporaneously with the owner, although he says that, while he was acting for the charterer, his connection with the owner was but nominal. However that may be, he knew all about their relations. It is one of the most common delusions of memory to suppose that we made clear to others what was, to us, a twice-told tale, when in fact we said nothing on the subject, or nothing that in any wise enlightened them.

The Quemahoning Coal Company, Incorporated, must therefore be held equally with its fellow supply man to have been without notice that the St. John was under charter.

It follows, from what has already been said, that each of them has a maritime lien upon the ship for the value of the coal furnished, and the decree below was right. In so saying we do not wish to give the impression that we are of opinion that any other result would necessarily have followed, had either, or both, of the supply men known that the ship was under charter. We are not unmindful that in a number of well-considered cases it has been said that, if the supply man has notice that the ship is under charter, he is bound to inquire whether its terms forbid the charterer to pledge the credit of the ship. But does such a holding give proper effect to the act of 1910? To say that notice of a charter puts a supply man upon inquiry is in effect to hold that there is no presumption that a charterer may charge the ship, but the statute says that precisely that presumption shall exist. The South Coast, 247 Fed. 89, 159 C. C. A. 302; The Yarmouth (C. C. A.) 262 Fed. 254.

Affirmed.

WOODS, Circuit Judge (dissenting). The general facts are stated in the majority opinion. The libelants supplied the coal in the port of Baltimore, not on the order of the owner or master, but on orders received from the office of the charterer in that city. They had no knowledge of the charter or of the ownership of the vessel, and made no inquiry as to either matter at the office of the charterer or elsewhere. The pertinent facts are substantially identical with those in The Valencia, 165 U. S. 264, 17 Sup. Ct. 323, 41 L. Ed. 710, under which the Supreme Court held that the libelant was not entitled to a lien on the vessel, because "the circumstances of the transaction put him on inquiry as to the existence and terms of the charter party, and he failed to make such inquiry, and chose to act on a mere belief that the vessel

would be liable for his claim." That case, therefore, seems conclusive, unless the law has been so changed by the act of 1910 (36 Stat. 604) that one who furnishes supplies to a vessel on the order of a charterer acquires a lien against the owner of the vessel, although the charter forbids the creation of such lien by the charterer, and the furnisher with source of information at hand makes no inquiry as to the ownership or existence and terms of a charter.

The Yankee, 233 Fed. 926, 142 C. C. A. 593, The Oceana, 244 Fed. 80, 156 C. C. A. 508, The South Coast, 247 Fed. 89, 159 C. C. A. 302, and The Yarmouth (C. C. A.) 262 Fed. 254, are relied on as holding that the statute has that effect. In each of these cases the court recognized the authority of The Valencia, and distinguished the facts in the case under consideration. In three of them stress was laid on the fact that the supplies were furnished on the order or the receipt of the master, who was in charge of the vessel by appointment of the owner. But, whatever may be the purport and force of these decisions, it seems to me that the Supreme Court has refused to construe the act as making the radical change of relieving the furnisher of supplies of the obligation to make inquiry concerning the ownership of the vessel and the existence and terms of a charter, under the circumstances appearing here and in the case of The Valencia. In Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co., 254 U. S. 1, 41 Sup. Ct. 1, 65 L. Ed. ——, decided October 11, 1920, the court says:

"The act relieves the libelant of the burden of proving that credit was given to the ship when necessaries are furnished to her upon order of the owner, but it in no way lessens the materialman's burden of proving that the supplies in question were furnished to her by him upon order of the owner or of some one acting by his authority. The maritime lien is a secret one. It may operate to the prejudice of prior mortgagees or of purchasers without notice. It is therefore stricti juris and will not be extended by construction, analogy or inference. The Yankee Blade, 19 How. 82, 89; The Cora P. White, 243 Fed. 246, 248."

In the light of this case, and the case of The Valencia, I venture to think that sections 2 and 3 of the act of 1910 (Comp. St. §§ 7784, 7785) mean this: A charterer, or owner pro hoc vice, or agreed purchaser, or any person to whom the management of the vessel at the port of supply has been intrusted by any one of them, will be presumed to have authority from the owner to procure repairs, supplies and other necessaries, for which the furnisher shall have a lien; but the presumption is not available to the furnisher, when he knew or by the exercise of reasonable diligence could have ascertained that, because of the terms of a charter party, or agreement for sale, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor.

To hold that the furnisher was not bound to make inquiry when the source of information was at hand, as in this case, is to deny any effect to the express and carefully framed limitation of section 3. It is no hardship to the furnisher to require him to make the inquiry of the person in charge of the vessel, or the owner, or the charterer, or other persons at the port of supply who would be naturally expected

to know and tell the truth. On the other hand, the owner of the vessel could not possibly protect himself by notifying or even ascertaining all the persons who might be called on by the charterer or other person in charge of the vessel to furnish supplies.