## THE A. S. SHERMAN.

District Court, N. D. New York.
Nov. 7, 1930.

George E. O'Connor, of Waterford, N. Y., for libelant.

James Farrell, of Troy, N. Y., for respondent.

COOPER, District Judge.

This is a libel filed May 2, 1928, against the steam tug A. S. Sherman for coal deliv-

ered to it at Waterford, N. Y., in September, October, and November, 1927.

On July 16, 1927, the tug was chartered by its owners under a bare boat charter to the Independent Barge Canal Towing Company of Buffalo for the season of 1927 which ended about December 20th. The charter was brief and simple and required the charterer to pay all operating expenses and to furnish all fuel, supplies, wages of crew, etc.

The word "lien" was not mentioned in the charter, and there were no words therein forbidding the charterer from procuring necessaries on the credit of the tug.

Captain Herman Frantz, a half owner of the tug, was employed by the charterers as captain or master at a wage independent of the charter hire.

At or about the time of the charter, Captain Frantz told Frank M. Crane, the president of the libelant, the Peck Coal Company of Cohoes, N. Y., with whom he was well acquainted and had had many business transactions, that he had chartered the tug as a bare boat to the Independent Towing Company, and that he (Frantz) was employed by the charterer as captain of the tug. Frantz further said that the Peck Company was to coal the tug and send the bills therefor to the charterer at its main office at Buffalo. No further inquiry about the charter was ever made by Crane.

Crane testified that he told Frantz that he would only sell the coal on the credit of the tug. This Frantz flatly denies. Eighteen deliveries of coal were made to the tug between July 16th and November 25th. The bills were all sent to the charterer, and no bills were sent to the owners.

The charterers paid for eight deliveries of coal on July 16, 21, 26, August 2, 4, 6, 9, and 19.

For coal delivered on ten occasions after August no payment has been made and libel is for the value of these ten deliveries made on September 1, 5, 9, 19, 26, October 6, 22, November 1, 17, 25, amounting to $1,114.75.

It is undisputed that coal in the amount specified in the libel was actually delivered to the tug, that the price indicated in the libel is the agreed or market price, that such price remains unpaid, and that the coal was necessary to the operation of the tug.

The Peck Coal Company furnished coal to other tugs operated by the Independent Company prior to and after July 16th, but whether on the credit of the boats or the charterer does not appear by the evidence, but the bills were likewise sent to the charterer and all amounts paid therefor were paid by the charterer as far as appears by the record.

There is a sharp issue of fact as to whether these 18 deliveries of coal were made on the order of Captain Frantz, the master of the tug, or of Frank H. Godfrey, the agent of the charterer at Waterford, who was in charge of the movement of this and other tugs of the charterer and one of whose duties was to procure fuel and supplies for the tugs. Crane and his bookkeeper, Miss Anna A. O'Connor, testify that Captain Frantz personally ordered all the coal, usually over the telephone. Godfrey, no longer in the employ of the charterer, which because of financial difficulties ceased business in 1927, who was also well known to Crane, testified that he personally ordered the coal over the phone, except possibly on one or two occasions when he believes his wife ordered it. His wife was not sworn. Frantz testified positively that he ordered no coal after the charter was entered into, and that he frequently heard Godfrey order the coal over the phone.

Slips were made out in triplicate with each delivery of coal. Two accompanied the load. One was signed by the person in charge of the boat and returned to the coal office. One was delivered with the coal to the person in charge of the tug, and the third slip remained in the coal office. Most of the signed delivery slips were signed by Captain Frantz himself. All of the signed slips for delivery of coal in July and August bore the words "Tug Sherman and owners." None of the signed delivery slips dated after August originally bore the words "and owners," but contained merely the words "Tug Sherman." After the return of the signed delivery slips to the coal office, Crane added the words "and owners" on the signed slips for September 1, 5, 9, 18, 26, and October 6. But these words "and owners" were not on the duplicate slips delivered with the coal to the tug, and, of course, never came to the attention of claimants. Crane went to a hospital October 16, 1927, and had no further personal connection with any of the transactions.

Bills were sent to the charterer shortly after each shipment and each of these bills for delivery made in July and August contained the words "Tug Sherman and owners," but these bills never came to the attention of Captain Frantz or the other owner of the tug.

Some time in August, according to Crane, Frantz objected to the tug being held for the

coal, but he signed the slip. Frantz does not deny objecting to the tug being held liable for the coal, but denies that he ever saw the words "and owners" on any slips.

About September 1, 1927 or shortly thereafter, perhaps September 6 or 7, Frantz and Crane had a further talk about the charterer's financial responsibility which has a bearing chiefly on the subject of waiver and is referred to under that subject.

The libelants sent statements to the charterers on the first of each month for coal supplied to the various tugs during the preceding month, among which were included the coal delivered to the Sherman. The bills for coal delivery on September 1, 5, and 18 contained the words "Tug Sherman and owners." All the remainder of the bills read "Tug Sherman" only. The monthly bills dated December 1, 1927 and January 1, 1928, contained a rubber stamp request for payment.

No further communications passed between the libelants and either the charterers or owners, and on May 2, 1928, the boat was taken under the libel and released on bond.

The claimant-respondent contends that no lien lies, for the reason that the coal was not ordered by the master of the tug, but by an agent of the charterer; that, even if ordered by the master, he had no authority to bind the vessel, and that, in any event, if any lien did arise, the libelant waived the lien and held only the charterer for the coal. The statute controlling here is found in sections 971–974, 46 USCA.

Section 971 declares that a maritime lien shall exist for necessaries furnished to the ship.

Sections 972 and 973 read as follows:

"§ 972. Persons authorized to procure repairs, supplies, and necessaries. The following persons shall be presumed to have authority from the owner to procure repairs, supplies, towage, use of dry dock or marine railway, and other necessaries for the vessel: The managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is intrusted. No person tortiously or unlawfully in possession or charge of a vessel shall have authority to bind the vessel.

"§ 973. Notice to person furnishing repairs, supplies, and necessaries. The officers and agents of a vessel specified in subsection Q,* section 972, shall be taken to include such officers and agents when appoint-

* "Subsection Q," should be omitted.

ed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel; but nothing in this chapter shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor."

The libellant unquestionably knew that the tug Sherman was under charter to the Independent Towing Company. Having been told that it was a bare boat charter, and having made no further inquiry as to the terms thereof, it must be held that the libelant is bound by the terms of the charter, which he might have ascertained by due inquiry. U. S. v. Carver, 260 U. S. 482, 43 S. Ct. 181, 67 L. Ed. 361.

The primary question is whether, by the terms of the charter, the libelant had a maritime lien under the statute for the coal furnished to this tug, whether the coal was ordered by the master of the tug or by an agent of the charterer claimed to have the management of the tug in the port at which the coal was obtained and to be one of the ship's representatives named in sections 972 and 973 of the statute.

The charter provided that the charterer should procure coal and other supplies. There is no mention of lien in the charter and no prohibition against a lien and no provision for the removal of liens by the charterer. As far as the charter is concerned, the duty was on the charterer to procure and pay for the coal for the tug. If the charter provision that the charterer should furnish the coal is equivalent to a prohibition against the charterer doing anything by which a lien could be imposed on the tug or is equivalent to a withholding of power to bind the boat, the claimant must prevail. But if it is not such equivalent, the libelant should prevail unless it has waived the lien which is discussed later herein.

The authorities are not agreed on the application of the statute to such a charter as the one in suit. The better authorities, however, seem to hold that one who furnishes necessaries to the tug ordered by one of the persons named in the statute has a maritime lien on the boat unless the charter, by the terms of which he is bound, if he fails to make inquiry, definitely and affirmatively prohibits the authority of the charterer to procure necessaries upon the credit of the boat. The

South Coast, 251 U. S. 519, 40 S. Ct. 233, 64 L. Ed. 386.

The facts in this case are best shown by the opinion in the Circuit Court of Appeals of the Ninth Circuit (247 F. 84). The salient provisions of the charter party were as follows: "Fifth. It is understood that this charter is a charter of the bare vessel, and that said party of the second part [the charterer] shall furnish the crew, pay their wages, victual them, furnish all deck and engine room and saloon stores and supplies of every kind and nature, pay for all fuel * * * and pay all other charges whatsoever of every nature * , * * that may be incurred in or about the use of said vessel during the term of this charter."

By the sixth paragraph the owner is accorded the right to appoint the master, who is to be under the orders of the charterer as to management of the ship and whose wages are to be paid by the charterer. The charter also provided that on default in the payment of charter hire, or failure to discharge all liens within thirty days and at the expiration of the charter, the charterer would deliver the boats to the owners "free from all liens and claims of every kind or description * * * except the lien for any salvage services."

The owners, fearing that supplies would be furnished upon the credit of the vessel, notified the furnisher of the supplies that the steamer was under charter, and that he must not furnish supplies upon the credit of the vessel. The coal was supplied upon the order of the master of the boat acting under the order of the charterers. The lien on the vessel for fuel was allowed by the District Court and affirmed by the Circuit Court of Appeals. The Circuit Court of Appeals said: "It is the purpose of the statute, as it was the purpose of the law previous thereto, that the furnisher of such commodities as are necessary to enable a ship to enter upon or pursue her voyage, and to engage in maritime traffic, to which only she is adapted, shall have a lien on the ship therefor. It is in the interest of shipping, conducted upon maritime waters, that such should be the case, as otherwise credit would not be extended, upon the account of the owner or master alone, to enable the ship to discharge its peculiar function, and great inconvenience would follow, to the detriment and disadvantage, if not the ultimate disaster in large measure, of maritime shipping. Many ships sail under charter, either verbal or in form of regularly drawn charter parties, and it is usual and customary for the charterer in either event

to disburse the necessary expenses of the ship; and of this all persons furnishing supplies, etc., to a chartered ship must be deemed to have notice. But notwithstanding this notice, or even knowledge that the ship is under charter, we cannot believe that it was the intendment of the statute or of the law that the furnisher should, because of that fact, be deprived of his lien when advancing necessary repairs or supplies in good faith to enable the ship to engage in her accustomed traffic. Nor do we believe that it was the intendment of the statute or of the law thus to impose so vital a hindrance upon maritime shipping, and unless there is something more in the charter party, that unalterably inhibits the master or the charterer from incurring any expenditures on the credit of the ship that may become a lien thereon, the master's ordinary authority is not impaired or abbreviated; nor can the right of the furnisher of repairs, etc., to extend credit to the ship, and his consequent lien, be so subverted."

When this case came to the Supreme Court of the United States, that court said, in affirming the decree: "By the Act of June 23, 1910, c. 373, § 1, 36 Stat. 604, a maritime lien is given for such supplies and by section 3 a presumption is declared that a master appointed by a charterer has authority from the owner to procure them. It is true that the act goes on that nothing in it shall be considered to give a lien where the furnisher knew, or by the exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, or for any other reason, the person ordering the necessaries was without authority to bind the vessel. But the authority of the owner to prohibit or to speak was displaced, so far as the charter went, by that conferred upon the charterers, who became owners pro hac vice, and therefore, unless the charter excluded the master's power, the owner could not forbid its use. The charter party recognizes that liens may be imposed by the charterers and allowed to stand for less than a month and there seems to be no sufficient reason for supposing the words not to refer to all the ordinary maritime liens recognized by the law. The statute had given a lien for supplies in a domestic port and therefore had made that one of these ordinary liens. Therefore the charterer was assumed to have power to authorize the master to impose a lien in a domestic port, and if the assumption expressed in words was not equivalent to a grant of power, at least it cannot be taken to have excluded it. There was nothing from which the

furnisher could have ascertained that the master did not have power to bind the ship."

It will be seen that the charter and the facts are very similar to those in the case at bar, except that the charter here is silent on the question of liens, while in The South Coast the charter provided for the prompt removal of lien. In several of the Circuit Courts of Appeals decisions since The South Coast, that case has been followed and interpreted as holding that a lien for necessaries arises unless the charter prohibits the charterer from binding the boat.

In The Portland, 273 F. 401, 404 (C. C. A. 9, 1921), the charter required the charterer to supply the fuel for the ships. The libelant furnished supplies on the order of the charterer. In holding the oil merchant entitled to a lien, the court, in the Ninth Circuit, interpreted the South Coast Case as follows: "The real ground for the ruling in The South Coast was that the supplies were furnished on orders from the master, and the master had the power to impose a lien unless the charter party excluded the possession of such power."

The Anna E. Morse, 286 F. 794 (C. C. A. 3, 1922), certiorari denied 262 U. S. 759, 43 S. Ct. 705, 67 L. Ed. 1219. In that case the company in possession of and operating the boats agreed to provide and pay for all supplies, etc. The fuel was ordered by the company operating the boats. In allowing the lien for the fuel, the court said in part:

"Under Merchant Marine Act June 5, 1920, § 30, subsecs. P–T, the law presumes that one intrusted with a ship has the owner's authority to procure supplies on the pledge of the ship, unless the owner had withheld his authority and the furnisher knew it, or by diligence could have ascertained it. * * *

"A contract between the Emergency Fleet Corporation and an agent for the operation of the ships, requiring the agent to provide and pay for all provisions, equipment, and supplies, and perform all customary duties of managing and operating owner, but containing no provision withholding authority to procure supplies on the credit of the ships, was insufficient to defeat the authority presumed by law to order supplies on such credit under Merchant Marine Act June 5, 1920, § 30, subsecs. Q and R."

These sections are now sections 971 to 975 of title 46, USCA.

In The Penza, 9 F.(2d) 527 (C C. A. 2, 1925), the charter provided that the charterer should pay for necessaries. The charter also

provided, " 'although appointed by the owners, the captain shall be under the order and direction of the charterers as regards employment, agency, or other arrangement,' " but there was no express prohibition of the master's power of procuring necessaries upon the credit of his ship. The court upheld a libel for coal, fuel, and supplies furnished the boat at the order of the master of the ship. The court said:

"But by the terms of the charter party there was no express prohibition upon the master to obtain necessaries, and coal and food certainly come within that category, upon the credit of the vessel. It is quite true that the owners hoped it would not be necessary for the master to go to such lengths to get what he had to have, and they did contract with the charterers to provide the same, but there was no prohibition on the power of the master, which existed before the statute and was recognized and indeed enlarged by the statute. * * *

"Thus it is seen that this master had the right to do what he did by traditional law and by statute, and was not prohibited from action by charter. Such a situation is plainly far within The South Coast, 251 U. S. 519, 40 S. Ct. 233, 64 L. Ed. 386, the facts in which case are best set forth in 247 F. 84, and those facts are totally different from those presented in United States v. Carver, 260 U. S. 482, 43 S. Ct. 181, 67 L. Ed. 361, where the ship was in the possession of purchasers on a partial payment agreement, who appointed the master, who ordered nothing, and both 'the partial payment owner' and its master were expressly prohibited by the purchase contract from hypothecating the vessel for what the master in the case did not order, and what the Penza's captain did of necessity procure.

"We find no similarity between this and the Carver Case; and The South Coast only shows a set of circumstances far more difficult for the lienor than is here presented."

It will thus be seen that the Circuit Court of Appeals in the Second, Third, and Ninth Circuits have held, since the statute of 1910 was enacted and since the South Coast Case was decided, that, where necessary supplies are ordered by the master or captain of the ship, whether appointed by the owner or the charterer, one who furnishes necessaries upon the order of the said captain is presumed to have furnished them upon the credit of the ship and to have a maritime lien upon the ship for the value of the necessaries, unless

the owner has in the charter definitely prohibited the charterer from procuring the necessaries upon the credit of the vessel.

It is contended by claimant here that the case of U. S. v. Carver, 260 U. S. 482, 43 S. Ct. 181, 67 L. Ed. 361, is decisive of this case in favor of the claimant. The ship in the Carver Case was owned by the United States, but was in possession of a corporation under the charter by which the corporation was to pay all costs and expenses incident to the use and operation of the vessels and "will not suffer nor permit to be continued any lien, incumbrance, or charge which might have priority over the title and interest of the owner in said vessel." It was also provided further that in any event within fifteen days the charterer would make adequate provision for the satisfaction or discharge of any claim that might have priority over the title of the owner.

The Supreme Court, in distinguishing this case from the South Coast Case, said: "But there is a sufficient difference in the language employed there and here to bring about a different result. In the South Coast, the contract went no farther than to agree to discharge liens within a month. Here the primary undertaking was that 'the charterers will not suffer nor permit to be continued any lien,' etc. We read this as meaning will not suffer any lien nor permit the same to be continued. Naturally there are provisions for the removal of the lien if in spite of the primary undertaking one is imposed or claimed. But the primary undertaking is that a lien shall not be imposed." See, also, The Penza, supra, for distinction between the two cases.

There have been many cases since U. S. v. Carver, 260 U. S. 482, 43 S. Ct. 181, 67 L. Ed. 361, holding that no lien lies where the charter expressly forbids. But these cases have no application here, for the charter did not expressly forbid.

There are also some cases holding that no lien lies where the charter merely required the charterer to procure and pay for necessary supplies, but does not expressly prohibit binding the boat. The other cases on which claimant relies are chiefly of this class and are as follows:

Curacao Trading Company v. Bjorge, 263 F. 693 (C. C. A. 5, 1920), certiorari denied, 253 U. S. 492, 40 S. Ct. 584, 64 L. Ed. 1028. The time charter here provided that the charterer should provide and pay for supplies. There was no prohibition against liens. The libelant was under contract with the charterers to furnish coal for all steamers of which they were owners, charterers, time charterers, or in which they were otherwise interested and furnished the coal when the vessel came to port. The coal was delivered after request of and promise by the charterers to pay for the same. The court held that there was no lien.

In Pensacola Shipping Co. v. U. S. Shipping Board et al., 277 F. 889 (C. C. A. 5, 1922) the same Circuit Court of Appeals held a like charter as excluding authority of the charterer to bind the vessel.

The Bjorge Case is followed in the Dictator, 18 F.(2d) 131 (D. C. La. 1927), a District Court case in the same circuit, where the charter provided that the charterer should pay for all coal and port charges. In this case, however, libelant was under contract with the charterer "to supply all the bunker coal that [charterer] may require * * * for the use of its steamers, * * * estimated to be the minimum of 1,500 tons, with the maximum of 6,000 tons."

The case of The St. Johns, 273 F. 1005 (C. C. A. 4, 1921) reversed in 260 U. S. 707, 43 S. Ct. 246, 67 L. Ed. 474, without opinion, cited by claimant, has little application here. The charter probably prohibited the charterer from allowing any liens for supplies for the boat, and the case turned upon the question of due diligence in ascertaining the terms of the charter in view of the knowledge of the libelant.

In the case of The Princess Matoika (D. C.) 298 F. 153, affirmed 1 F.(2d) 233 (C. C. A. 2, 1924), the charter prohibited liens in exactly the same words as did the charter in U. S. v. Carver, 260 U. S. 482, 43 S. Ct. 181, 67 L. Ed. 361, and this is distinguished from the case at bar.

In The Thordis, 290 F. 255 (D. C. E. D. N. Y. 1923) the charter there as here provided merely that the charterer should pay for supplies for the vessel and did not prohibit liens. It was held that there could be no lien because the charterer was without authority to permit a lien to be imposed on the vessel.

There are some cases in other jurisdictions to the same effect, such as the Ville de Djibouti, 295 F. 869 (D. C. E. D. Pa. 1924) and the very recent case, The Ben Lawers, 42 F.(2d) 897 (D. C. W. D. Wash. 1930).

Most of these cases have some distinguishing features, but such of them as do not seem in conflict with the Supreme Court decision in the South Coast Case. Contracting

parties are presumed to contract with full knowledge of the law.

 Where, therefore, a statute declares that a lien upon a ship for necessaries furnished arises when the necessaries are ordered by a master or other person intrusted with the management thereof, who is presumed to have authority to bind the ship unless by the charter party such persons are without such authority, it is a reasonable, if not a necessary, conclusion that to overcome such presumption of authority the parties must do so by language expressly and affirmatively prohibiting authority to bind the boat.

Upon reason and authority, therefore, it should be held that a mere provision in a bare boat charter that the charterer shall pay for necessary supplies is only a contract between the parties binding along on them and not intended to have and not having the effect of prohibiting the charterer from procuring necessaries upon the credit of the boat nor the effect of overcoming the presumption of the statute that the master or other person intrusted with the ship had authority to bind the ship for necessaries.

 Having come to the conclusion that, if not waived, the libelant is entitled to a lien on the tug if the coal was placed thereon at the order of some person so related to the tug as to be one of the persons named in the statute, it will not be necessary to decide whether the coal was ordered by Captain Frantz or Godfrey, if the status of both bring them within the statute. Clearly Captain Frantz was the master of the tug, and it matters not whether appointed by the owner or charterer. He was in fact appointed by the charterer, and his status so far as the statutory presumption that as master he had power to bind the boat for necessaries is concerned is the same as if he had no interest in the boat and was unacquainted with the owner.

Was Godfrey a person who was intrusted with the management of the tug at the port of Waterford within the meaning of section 972 of the statute? According to the testimony which is undisputed in this respect, he was intrusted by the charterer with the management of the tug Sherman and other tugs of the Independent Towing Company at the port of Waterford and vicinity, directed their movements, and ordered supplies and necessaries for them. It would seem as to all the tugs of the Independent Towing Company, including the Sherman, he was intrusted with the management within the meaning of the section. The Penn, 273 F. 990 (C. C. A. 3);

The Penn, 276 F. 118 (C. C. A. 3); El Amigo, 285 F. 868 (C. C. A. 5); The Oceana, 244 F. 80 (C. C. A. 2).

It is therefore unnecessary to decide whether the coal was ordered by Captain Frantz or Godfrey. If decision were necessary, it would be held that, considering all the circumstances and interests of the witnesses and the weakness of human memory, the coal was ordered by Godfrey and not by Frantz, at least so far as the coal delivered after August is concerned.

The claimant further insists that, if libelant would otherwise have had a lien, it has waived its right thereto.

Claimant relies on these facts or alleged facts that the libelant knew that (1) the tug was under charter to the Independent Company; that the bills were to be sent to the charterer; the bills were sent to the charterer and not to the owner; all payments received were made by the charterer. Such demand for payment as was made was made upon the charterer; the libelant well knew the owner (Frantz) believed the charterer irresponsible; the owner Frantz expressed to libelant its doubt of the ability of the charterer to pay either the coal bill or the charter hire and masters' wages; that it is unreasonable to suppose that the owner, being personally present, would permit coal to be supplied on the credit of the boat.

Claimant asserts that any lien based on the statutory presumption of authority of those intrusted with the management of the boat that might otherwise exist was waived by such acts and conduct. Claimants cite The Eastern, 257 F. 874 (D. C. Mass); The Millinocket, 266 F. 392 (D. C. E. D. N. Y.).

Certainly any protest against the libelant supplying coal on the credit of the boat was far less definite and vigorous than the protest in the South Coast Case where the lien was nevertheless held to lie.

In that case the libelant refused to furnish fuel except on the credit of the boat, and Crane testifies to the same thing here, but it is denied by Frantz.

Lack of responsibility on the part of the charterers would influence the furnisher of supplies to insist on holding a lien on the boat fully as much as it would induce the owner to insist on exempting his boat from lien.

But it is undisputed that Frantz and Crane talked about the uncertain responsibility of the charterer, and that the early bills before September 1st did contain the

words "Tug Sherman and Owners," and that some of the slips containing the same words were signed by Frantz, and duplicates thereof containing the same words were left with him. His statement that he does not remember seeing the words "and owners" on the slips is not sufficient to overcome the force of the signed slips. It is also doubtless true that Frantz protested against the slips indicating the coal was chargeable to tug and owners, but he continued to sign slips so reading.

It is undisputed that bills for coal furnished to the tug "Sherman" were sent to the charterers at Frantz' request or instruction. It is a reasonable inference that the sending of the bills to the charterer under the situation existing here was not intended by the libelant to be a waiver or surrender of its lien against the tug unless the bills were paid. This must be so at least as to all coal furnished before September 1, 1927.

Captain Frantz testified that shortly after September 1, probably about September 6 or 7, he and Crane had a further conversation about the charterer and its financial responsibility, in which Frantz said that toward the end of the season irresponsible charterers frequently gave the debtors "a beating." Frantz says Crane told him that he (Peck) would take a chance, as he had been paid regularly, and that he (Frantz) should take a chance. When asked what the chance was that was to be taken he (Frantz) replied that it was the payment for the coal. But at another time he said that he was worried about his money, meaning undoubtedly his wages and charter hire. It may be of significance that, from that time on, the slips delivered with the coal did not originally bear the words "and owners," nor did those for any deliveries after.

Peck says that such words were inserted by him on the signed slips after the delivery of the coal and the return of the signed slips to the coal office, at least so far as five or six duplicate slips are concerned, running from September 1 to October 6. On October 16, he went to the hospital and had no further active connection with deliveries thereafter made. The carbon copies of the bills sent by the Peck Company to the Independent Company for coal delivered to the tug after August bear the words "Tug Sherman and owners" as to the coal supplied on September 1, 5, 19, but only the words "Tug Sherman" appear on the bill for coal sold September 9, 26, October 6, 22, November 1, 17, and 27.

These bills were never brought to the attention of the tug owner or master and can only bind the libelant, but they were sent at the request of Frantz, who was both master of the tug and owner. On all but three the words "and owners" are lacking.

Do these things mean that after such conversation the libelant agreed to take a chance on getting his money from the charterer and thereafter omitted the words "and owners"? If the words "and owners" were no longer placed on any of the slips delivered with the coal after September 1, the acts and conduct of the parties seem consistent with a waiver of any lien on the boat and a willingness to rely on and take a chance on payment by the charterer.

On the other hand, the mere charging the price against the person on whose orders the necessaries were furnished does not affect the right to a lien on the boat. Nor is taking a bond for security. El Amigo, 285 F. 868 (C. C. A. 5).

One who charges waiver of lien and "holding of the charter exclusively liable has the burden of proof of establishing the waiver. The Dana (D. C.) 271 F. 356, The Hatteras (C. C. A.) 255 F. 518.

The question is whether or not there was intent to waive the lien.

The proof does not quite satisfy the court that the libelant intended to relinquish and waive a lien against the boat, though the matter is not at all free from doubt. From the fact that there was no other change of conduct of the parties except the omission of the words "and owners" from the slips delivered after September 1, that some delivery slips for coal delivered in September before September 6 or 7, the probable date of the conversation, omitted the words "and owners," that Crane put such words on all delivery slips returned to the office after their return for coal delivered from September 1 to October 16, the time he went to the hospital, although the claimant could have had no knowledge of his so doing, and that Crane had no connection with the coal sales after the last date, the court, not without some hesitation, is constrained to hold that claimant has not met the burden of proof of showing waiver of the lien.

Libelant has a lien on the tug for the amount claimed for which the bondsman is liable, and decree may be so entered.

## Additional Opinion.

Since writing the memorandum in the above case, counsel for the libelant has asked that certain statements of fact therein be amended because ambiguous or erroneous in stating the facts accurately.

The main portion of the objection runs to the following portion of the memorandum contained on page 783: "None of the signed delivery slips dated after August originally bore the words 'and owners' but contained merely the words 'Tug Sherman.' After the return of the signed delivery slips to the coal office Crane added the words 'and owners' on the signed slips for September 1st, 5th, 9th, 18th, 26th and October 6th. But these words 'and owners' were not on the duplicate slips delivered with the coal to the tug and, of course, never came to the attention of claimants."

It is true, as libelants contend, that Crane's statement that he added the words "and owners" on the signed slips was limited to the slips of September 1, 9, 26, and October. 6. These were the four duplicate slips produced by Captain Frantz, the claimant of the tug. Crane did not state that he added the words "and owners" to the said slips on September 5 and 18. The duplicates of these slips were not produced by Captain Frantz and were undoubtedly forwarded to the Independent Towing Company's office at Buffalo as the other duplicates were and as the four slips just mentioned would have been had not the routine in some way been interfered with.

Inspection of the slips of September 5 and 18 leads to the conclusion that the words "and owners" were subsequently added on these slips as they were on the slips of September 1, 9, 26, and October 6, and the court does so find, although there is no statement to that effect by Mr. Crane.

It should also be stated that the slip of October 22 did not contain the words "Independent Towing Company," but contained the name "Herman Frantz, Tug Sherman," and signed as received by F. H. Godfrey. It should also be clear that none of the slips after October 16, 1927, contained the words "and owners." It will be remembered that Crane went to the hospital on that day and the remaining transactions were handled by the clerk in charge, witness O'Connor.