**JAN C. UITERWYK CO., INC., Uiterwyk Terminal Corporation and Ryan-Walsh Stevedoring Company, Inc., Plaintiffs,**

v.

**MV MARE ARABICO, her engines, tackle, etc. and United Brands Company, Defendants.**

**JAN C. UITERWYK CO., INC., Uiterwyk Terminal Corporation and Ryan-Walsh Stevedoring Company, Inc., Plaintiffs,**

v.

**MV MARE AUSTRALE, her engines, tackle, etc. and United Brands Company, Defendants.**

Civ. Nos. H–76–517, H–76–1115.

United States District Court,
D. Maryland.

Nov. 7, 1978.

Barrett W. Freedlander and Niles, Barton & Wilmer, Baltimore, Md., for plaintiffs.

Donald C. Greenman and Ober, Grimes & Shriver, Baltimore, Md., for defendants.

## MEMORANDUM AND ORDER

ALEXANDER HARVEY, II, District Judge.

These two cases present questions arising under the Federal Maritime Lien Act, 46 U.S.C. §§ 971–975, as amended. The ultimate issue to be determined is whether a loss occasioned by the default of a space charterer who made the initial arrangements for the supplying of necessaries for certain vessels should be borne by the plaintiffs who supplied the necessaries or by the owner and the time charterer of the vessels. These two cases have been heard together, since the parties are the same and the same issue has been raised in both cases.

Plaintiffs are ship's agents, stevedores and warehouse operators. They have brought these *in rem* admiralty actions asserting maritime liens against two vessels for services and other necessaries which they have provided. The vessels were seized here in Baltimore and the owner of the vessels has filed answers and defended the claims asserted. Subsequently, an amended complaint was filed, joining the

time charterer of the vessel as a party defendant. Plaintiffs allege that they possess enforceable maritime liens against the MV MARE ARABICO for services performed in New Orleans, Louisiana in connection with two separate voyages of that vessel in July 1974 and February 1975. They assert a similar lien against the MV MARE AUSTRALE for services performed in March and April 1975, also in New Orleans. At all relevant times, these two vessels were owned by Oriens, S.p.A. (hereinafter "Oriens"), the claimant, and were time chartered to United Brands Corporation (hereinafter "United Brands").[1]

Presently pending before the Court are cross-motions for summary judgment. In support of these motions, the parties have filed numerous memoranda, affidavits, exhibits and excerpts from a deposition. Oral argument has been heard in open court. For the reasons hereinafter set forth, plaintiffs' motions for summary judgment will be granted, and Oriens' motion for summary judgment will be denied.

### The facts

As disclosed by the discovery,[2] the following facts are undisputed. Plaintiff, Ryan-Walsh Stevedoring Company, Inc. (hereinafter "Ryan"), is an Alabama corporation, which claims that it has not been paid $17,-727.23 for stevedoring services rendered to the MARE ARABICO in February 1975 and $22,607.53 for stevedoring services rendered to the MARE AUSTRALE in March and April of 1975. Jan C. Uiterwyk Co., Inc. (hereinafter "JCU"), another plaintiff, is a Florida corporation, which claims that it has not been paid in full for agency and terminal services rendered to the MARE ARABICO in July 1974 and February 1975, in the amount of $3,625.42. JCU also claims that it has not been paid $2,304.45 for agency services rendered to the MARE AUSTRALE in March and April of 1975.

Uiterwyk Terminal Corporation (hereinafter "UTC"), the third plaintiff, is also a Florida corporation, which claims that it has not been paid $10,881.04 for terminal services rendered to the MARE ARABICO in July 1974 and February 1975 and $4,764.35 for terminal services rendered to the MARE AUSTRALE in March and April of 1975. Thus, the amounts claimed by the plaintiffs, which aggregate $61,910.12, break down as follows:

| Plaintiff | MV MARE ARABICO | MV MARE AUSTRALE |
|---|---|---|
| Ryan | $17,727.23 | $22,607.53 |
| JCU | $ 3,625.42 | $ 2,304.45 |
| UTC | $10,881.04 | $ 4,764.35 |

In the fall of 1973, a Mr. Gil Heller entered into negotiations with a representative of JCU concerning services to be rendered by JCU and its affiliates to Mr. Heller and the companies he represented. Mr. Heller was in the business of shipping frozen meat from the United States to various destinations in South America. Following these negotiations, a formal Agreement was entered into on October 12, 1973 concerning the services to be provided by JCU and its affiliates at the port of New Orleans. The corporation which Mr. Heller initially designated as the contracting party was Beef and Produce Export Corporation (hereinafter "Beef and Produce"), although from time to time during the course of the dealings he designated other corporations.

Paragraph E of the October 12, 1973 Agreement covers the services involved in this litigation. That Paragraph provided that when Beef and Produce was authorized by the owners or charterers to engage a ship's agent in New Orleans, JCU was to be so appointed. All the services at issue here were furnished by or procured by JCU acting pursuant to said Paragraph E.[3] It was the understanding of JCU that Mr. Heller or Beef and Produce was the time charterer on those occasions when JCU was appointed

---

1. Oriens and United Brands will be referred to collectively herein as "the defendants."

2. Several sets of interrogatories have been filed and answered, and one or more depositions have been taken in this case.

3. The bulk of the services rendered by JCU and its affiliates under the Agreement are not involved in this litigation.

ship's agent. However, JCU was never shown a charter party between Mr. Heller or Beef and Produce and the owner of the ships, and Mr. Heller was always somewhat secretive concerning the relationship of his principal to the vessels involved.

As it turned out, neither Mr. Heller nor any of the companies he represented were time charterers of either the MARE ARABICO or the MARE AUSTRALE during any of the relevant times. Rather, Heller's companies were space charterers from United Brands, which was the time charterer from Oriens, the owner of the vessels. Under the time charter agreements between Oriens and United Brands, the masters of the two vessels were to be hired and paid by Oriens. These charters did not contain a "prohibition of lien" or "no lien" clause.

During the course of the Agreement, ten separate voyages were handled by JCU and its affiliates in various ways, three of which are the subject of this litigation. Plaintiffs customarily submitted bills to Beef and Produce and were paid by Beef and Produce. This arrangement continued until the spring and early summer of 1975, when payments from Beef and Produce were delayed and eventually stopped altogether. At some time in the summer of 1975, Beef and Produce went out of business and currently has no assets. After attempts to collect from Beef and Produce proved unsuccessful, plaintiffs brought suit in this Court, claiming maritime liens under 46 U.S.C. §§ 971 *et seq.*

### The existence of a maritime lien

The issue presented here is a question of law and involves the construction and application to these facts of §§ 971, 972 and 973 of Title 46, United States Code. These three Sections (and two others which are not pertinent here) govern the creation of maritime liens asserted by the suppliers of necessaries. In their present form, these Sections provide as follows:

§ 971. *Persons entitled to lien*

Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit *in rem*, and it shall not be necessary to allege or prove that credit was given to the vessel.

§ 972. *Persons authorized to procure repairs, supplies, and necessaries*

The following persons shall be presumed to have authority from the owner to procure repairs, supplies, towage, use of dry dock or marine railway, and other necessaries for the vessel: The managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is intrusted. No person tortiously or unlawfully in possession or charge of a vessel shall have authority to bind the vessel.

§ 973. *Notice to person furnishing repairs, supplies, and necessaries*

The officers and agents of a vessel specified in section 972 of this title shall be taken to include such officers and agents when appointed by a charterer, by an owner *pro hac vice*, or by an agreed purchaser in possession of the vessel.

As summarized in Gilmore and Black, *The Law of Admiralty*, § 9–46a at 685 (2d Ed. 1975) (hereinafter referred to as "Gilmore and Black"), these Sections, which are part of the Federal Maritime Lien Act, today have the following effect:

[C]ontract liens may arise when services are furnished to a vessel "upon the order of the owner * * * or of a person authorized by the owner"; (§ 971), and * * * the "managing owner, ship's husband, master or any other person to whom the management of the vessel is intrusted" are presumed to have authority to create liens (§ 972) even though they may have been appointed by a "charterer * * * an owner *pro hac vice* or * * * an agreed purchaser in possession of the vessel" (§ 973).

Significantly, the Lien Act was amended by Congress in 1971. As originally enacted, the second clause of § 973 greatly restricted the presumption of authority created by § 972 and the first clause of § 973. The

second clause of § 973 previously provided as follows:

[B]ut nothing in this chapter shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel.

Questions arising under this provision were resolved by the courts against the supplier of necessaries so that "the duty to inquire provision was, in effect, allowed to swallow up the presumption of authority provisions." Gilmore and Black, § 9–42 at 674. See, e. g., Dampskibsselskabet Dannebrog v. Signal Oil Co., 310 U.S. 268, 60 S.Ct. 592, 84 L.Ed. 998 (1940). It became standard practice to insert "prohibition of lien" or "no lien" provisions in charter parties, thus effectively shifting the risk of loss to the supplier. Because of the nature of the shipping business, suppliers rarely have enough time to review complicated charter provisions before entering into contracts for the furnishing of necessaries to a vessel which might be in a port for only a short period of time. Accordingly, the supplier "usually end[ed] up assuming the risk that his bill [would] be paid." House Report No. 92–340, 1971 U.S.Code Cong. & Admin. News, pp. 1363, 1364. Making it easier for a supplier to assert a valid lien encourages the prompt furnishing of necessaries to vessels so that they may be speedily turned around and put to sea, an especially significant maritime goal today when the emphasis on vessel performance is reduced port time and increased speed. Idem, at p. 1365.

In response to this problem, Congress in 1971 amended § 973 by deleting the provision placing a "duty to inquire" on the furnisher. P.L. 92–97, 85 Stat. 285. To properly construe the Lien Act, this Court must determine the intention of Congress in amending the statute as it did in 1971. See Lake Union Drydock Co. v. MV POLAR VIKING, 446 F.Supp. 1286 (W.D.Wash. 1978).

Plaintiffs argue that Congress intended by the 1971 amendment of the statute to benefit the suppliers of necessaries by creating a maritime lien in their favor every time necessaries were furnished, regardless of the authority, or lack of it, of the person or entity requesting the services. Under plaintiffs' view, it is the nature of the services that is critical under the statute and the authority of the person or entity ordering the services is irrelevant if the services benefit the ship and are necessaries.

Defendants, on the other hand, argue that by the 1971 amendment, Congress merely intended to do away with a supplier's duty to inquire about a prohibition of lien clause in the charter party. Although defendants are not here relying on a "no lien" clause in the time charter, they are contending that the 1971 amendment did not change the existing law that no lien is created unless the services were ordered by one who is actually authorized by the owner (pursuant to § 971), or one who is presumed to be so authorized (pursuant to §§ 972 and 973). Thus, defendants assert that no lien was created in these cases because Beef and Produce was neither authorized by Oriens to order the services and incur a lien, nor was it one of the persons or entities presumed to be so authorized.

■ Both plaintiffs and defendants rely on the legislative history of the 1971 amendment in support of their respective positions. Although the legislative history is somewhat conflicting, see Lake Union Drydock Co. v. MV POLAR VIKING, supra, this Court is satisfied that the interpretation advocated by plaintiff goes well beyond what Congress intended to do. The House Report focuses on the problem created by the "no lien provision" and states that the purpose of the amendment is to "permit a supplier to acquire [a] lien despite a 'prohibition of lien' clause in the charter party." 1971 U.S.Code Cong. and Admin.News, p. 1363. But more importantly, Congress left intact § 971, § 972 and the first clause of § 973. These provisions together permit the creation of a lien only where the services are ordered by one of a limited class of

persons or entities, namely, the owner or a person actually authorized by the owner *or an individual like the master of a ship or a charterer entrusted with the management of the ship, both of whom are presumed to have the owner's authorization.*

The question raised by the facts of these cases is whether these services were procured by one with the actual or presumed power to create the lien. Defendants assert that the services at issue here were procured not by the masters of these ships but by Beef and Produce and by Beef and Produce alone. Defendants argue that because Beef and Produce was merely a space charterer and had no power to determine the destination of the ships, it was not a "person to whom the management of the vessel [was] intrusted," and thus that Beef and Produce could not be presumed under § 972 to have been authorized by the owner to bind the ship. *See Dampskibsselskabet Dannegrog v. Signal Oil Co., supra.*

This Court is satisfied that defendants take much too restricted a view of the conduct of their representatives, as shown by the undisputed facts here. Undoubtedly, Beef and Produce was the party which first engaged plaintiffs' services. However, it is also clear, both because of the nature of the services rendered and because of the conduct of the masters of these vessels and of representatives of United Brands, that Beef and Produce had either the express or implied authority from United Brands, the charterer, and from the masters themselves to procure the services of plaintiffs on behalf of the ship.

The services themselves all involved the furnishing of necessaries; that is, they were necessary to the vessel as a vessel and permitted her to make her voyage. *THE MAJESTIC II,* 285 F. 91 (D.Fla.1922).[4] They included stevedoring services, terminal services, the payment of wharfage, dockage and sheddage charges, port fees and assessments, the preparation of legal documents and other services normally performed by an authorized ship's agent. Arrangements for these services must be made by the ship's master or someone authorized by him, or by a representative of the charterer, if the ship is to come into a port, discharge or take on cargo, and go back out to sea. Under the charter party between Oriens and United Brands, United Brands was duty bound to procure these services for the ship.

More importantly, both United Brands and the ships' masters not only acquiesced in the employment of plaintiffs but even actively cooperated in the performance of plaintiffs' services. This Court would note that on July 19, 1974, the master of the MARE ARABICO executed an authorization permitting JCU to sign, on behalf of the master and/or owner, bills of lading and other documents pertaining to cargo shipped aboard the vessel. The record here discloses that similar authorizations were executed by the ships' masters in connection with the other two voyages involved here. Several letters and telex messages between United Brands personnel indicate that they knew of and approved JCU's acting as ship's agent for each of the three voyages in question. Affidavits and reports of surveyors disclose that on each of the voyages, the ship's master and the crew cooperated with and in some instances directed the activities of the stevedores furnished by plaintiffs, insofar as the stowage of cargo was concerned. Customs forms were executed by the vessels' masters, indicating that JCU was the ship's agent. Finally, plaintiffs' affidavits and exhibits indicate that on at least one occasion, the ship's master ordered services directly from JCU without going through Beef and Produce as an intermediary. In particular, the Court would note a telex message dated July 16, 1974 from a United Brands official in Boston to another official in New Orleans, instructing the master of the MARE ARABI-

---

4. Stevedoring services are included within the term "necessaries" in § 971. *THE HENRY S. GROVE,* 285 F. 60 (D.Wash.1922).

CO to hire a Lloyd's surveyor to confirm cargo space temperature. This surveyor was subsequently retained by JCU, which paid his fee.

The only reasonable inference to be drawn from these undisputed facts is that United Brands, and Oriens through the ships' masters, knew of and approved of the employment by Beef and Produce of the services of plaintiffs as suppliers of necessaries. The selection of JCU and UTC as ship's agents by Beef and Produce was unmistakably ratified and confirmed by the masters of the ships and by United Brands, and in some instances, even ordered by the master of the vessel or by United Brands. Whichever entity may have actually ordered the performance of services by plaintiffs, the services were furnished to the MARE ARABICO and the MARE AUSTRALE, they were accepted by the ships' masters, the vessels themselves benefitted from their performance and the ordering of the services was ratified by the ships' masters on behalf of the owner and by representatives of the charterer.

Under all these facts, it was entirely reasonable for the plaintiffs to assume that Beef and Produce had been authorized by the shipowner to order these necessaries on its behalf. The agreement between JCU and Beef and Produce provided that JCU was to be appointed ship's agent in New Orleans when Beef and Produce was authorized by the owner or charterers to engage a ship's agent in that port. In various pertinent documents, the masters of the vessels referred to JCU as "ship's agent", thus ratifying the appointment on behalf of the shipowner or on behalf of the time charterer acting for the shipowner.

On the record here, this Court concludes that the services in question were, as required by § 971, furnished to these vessels upon the order of a person authorized by the owner, Oriens. Pursuant to §§ 972 and 973, the masters of these vessels were presumed to have had the authority to create these liens. In the absence of a "no lien" clause in the time charter, representatives of the time charterer were also presumed to

have this authority. There is no evidence in this record to overcome the statutory presumption. As amended in 1971, the Lien Act now requires that the supplier of necessaries have actual knowledge of the lack of authority of the master or charterer to procure the services. See Lake Union Drydock Co. v. MV POLAR VIKING, supra, at 1291. Thus, the Act now requires that the owner take affirmative action to notify the supplier of necessaries that the master of a vessel or the charterer is *not* authorized to order services, the performance of which will result in the creation of liens. No such action was taken by Oriens on the occasions involved in these cases.

■ In its present form, the Lien Act is to be construed in favor of the supplier of necessaries over the owner in situations such as those present in these two cases. *Nacirema Operating Co., Inc. v. SS AL KULSUM,* 407 F.Supp. 1222, 1225 (S.D.N.Y. 1975). This does not mean, as contended by plaintiffs, that the lien vests absolutely as a matter of law, but rather that the burden is upon the owner to show that the supplier of necessaries had actual knowledge of the existence of any lack of authority relied upon as a defense. Although there was a "no lien" clause in the space charter agreement between United Brands and Beef and Produce, there is no evidence at all that plaintiffs had knowledge of that clause.

Citing Gilmore & Black, § 9.44 at p. 678, defendants argue that although a time charterer has authority to impose maritime liens on a vessel, a space charterer or shipper does not. Under circumstances other than those here, there might be validity to this contention. But in these cases, the space charterer was impliedly authorized to act for the owner and the time charterer. It is hardly the responsibility of a mere shipper to arrange for services necessary for a vessel to enter a port, to receive cargo and to leave the port. These are arrangements traditionally undertaken by the entity with direction and control over the vessel (namely the time charterer), for absent the services in question, the vessel could not even operate in a particular port. When

Beef and Produce initially engaged plaintiffs, it was impliedly authorized by United Brands to act as it did. Implied authority is created by acts or conduct which reasonably interpreted cause a third person to believe that the principal consents to have the act done on his behalf by the person purportedly acting for him. *Parker v. Junior Press Printing,* 266 Md. 721, 727–28, 296 A.2d 377 (1972). As noted, the authorization here was later ratified and confirmed by the masters of the vessels and by representatives of United Brands.

No case directly on point has been cited by the parties involving a supplier of necessaries engaged by a space charterer to provide services benefitting two ships on three occasions, and indirectly benefitting the ship's charterer. However, those courts which have considered similar situations have upheld maritime liens where the owner or operator of the ship knew of services ordered by other parties and accepted the services without objection. For example, in *Yacht MARYJANE v. Broward Marine, Inc.,* 313 F.2d 516 (5th Cir. 1963), the Fifth Circuit affirmed the district court's upholding of a lien where the district judge concluded that "there was in effect an implied authorization resulting—if from no other thing—from the failure of the owner's real captain to object while the disputed work was, to his obvious knowledge, going on." 313 F.2d at 517. In *Warner v. THE BEAR,* 130 F.Supp. 549 (D.Alaska 1955), the Court held that the owner's knowledge, his limited participation in negotiations, and his receipt of the benefit of the work were sufficient to estop him from denying that he had impliedly authorized the work. *See also Shaw v. 46 Foot Chris-Craft CAMELOT,* 391 F.Supp. 1026 (W.D.Wash.1975) (owner's knowledge was one of several factors supporting a lien).

■ For all these reasons, this Court is satisfied that defendant Oriens impliedly authorized the performance of services rendered by plaintiffs. Accordingly, this Court concludes that plaintiffs are on this record entitled to maritime liens against the MV MARE ARABICO and the MV MARE AUSTRALE, pursuant to 46 U.S.C. §§ 971–975. Judgment will therefore be entered against defendant Oriens in both cases.

### Claims against United Brands

These suits were commenced as actions *in rem* against the two vessels for which services had been performed. Thus, the liability of defendant Oriens, the owner of the vessels, has been established pursuant to the Federal Maritime Lien Act, 46 U.S.C. §§ 971–973.

However, defendant United Brands, the time charterer of these vessels, has also been sued in these cases *in personam.* Its liability, *vel non,* must therefore be examined without reference to the Lien Act. However, the same facts which establish that plaintiffs have enforceable maritime liens against the MARE ARABICO and the MARE AUSTRALE also establish that the plaintiffs are entitled to recover from defendant United Brands under general principles of contract and agency law.

Under the charter parties between Oriens and United Brands, Oriens was responsible for manning the vessels but United Brands was charged with the responsibility for directing and controlling the activities of the masters. Pursuant to 46 U.S.C. § 972, the masters of these vessels were presumptively the agents of Oriens, with authority to create liens against the vessels. Indeed, Oriens was apparently satisfied that the masters of the MARE ARABICO and the MARE AUSTRALE should have this authority because a "no lien" clause was not included in the charter parties.

■ But the masters of these vessels were also, under the facts here, the agents of United Brands, with the apparent authority to bind United Brands for the payment of debts incurred on behalf of the vessels. Under the terms of the time charters, United Brands was to direct and control the activities of the vessel, and the masters were to act pursuant to orders from United Brands. When the masters ordered certain of these services, when they cooperated in the performance by plaintiffs

of certain other services necessary for the accomplishment of the voyages in question and when they accepted all of these services, they were acting not only on behalf of Oriens but also on behalf of United Brands as well, with apparent authority to enter into these contracts on behalf of United Brands. Moreover, as indicated, the record here also shows conduct by other employees of United Brands, indicating that the services were being ordered on behalf of and were being accepted on behalf of this time charterer.

Under these circumstances, this Court concludes that United Brands is also liable to the plaintiffs for the amounts claimed. Judgments will accordingly be also entered against defendant United Brands in both cases.

### Waiver and laches

■ Defendants have also raised in these cases the defenses of waiver and laches. Essentially, both defenses are based upon defendants' contention that plaintiffs cannot recover because they looked for payment first from Beef and Produce and because they delayed too long before seeking to enforce maritime liens. Over the objection of plaintiffs, the Court has permitted defendants to undertake discovery for the purpose of developing facts relevant to these defenses. One or more depositions have been taken, and various documents have been produced by the plaintiffs. However, the deposition excerpts and the documents filed in these cases do not disclose facts that would support the defenses of waiver or laches.

In his deposition, Mr. Hendrik Uiterwyk,[5] generally related a series of attempts on the part of JCU and UTC to collect outstanding debts from Beef and Produce. These included several letters and telephone calls to Mr. Heller of Beef and Produce, who was the individual with whom the plaintiffs most often dealt. Defendants rely heavily on a letter dated June 20, 1975, in which Mr. Uiterwyk wrote to Mr. Heller expressing alarm at the size of the bills owed by Beef and Produce. At this time, the amounts due on the two MARE ARABICO voyages had been owed for approximately twelve months and five months respectively and the amounts due on the one MARE AUSTRALE voyage had been owed for approximately three months. Ten days earlier, Mr. Uiterwyk had retained New Orleans counsel for assistance in collecting the amounts owed. Soon thereafter, Mr Heller disappeared, and no further communication was received from him or his companies.

Some nine months later, in April 1976, defendants were put on notice as to the claims asserted by the plaintiffs against the two ships when the MARE ARABICO was seized and when a letter of undertaking was issued by United Brands in lieu of the arrest of the MARE AUSTRALE. Suit was filed in this Court on April 6, 1976 against the MARE ARABICO and on July 28, 1976 against the MARE AUSTRALE.

With regard to the defense of waiver, the mere fact that plaintiffs looked to Beef and Produce for payment in the first instance and received some advance payments cannot overcome plaintiffs' statutory right to a maritime line. *Lake Union Drydock Co. v. MV POLAR VIKING, supra* at 1292; *Nacerima Operating Corp. v. SS AL KULSUM, supra* at 1226. *See Layton Industries v. Sport Fishing Cruiser GLADIATOR*, 263 F.Supp. 356, 359 (D.Mass.1967); *THE DENELFRED*, 59 F.2d 213 (E.D.Mich.1932); *THE A. S. SHERMAN*, 51 F.2d 782, 789 (N.D.N.Y.1930). Defendants have produced no evidence at all that plaintiffs "clearly manifested an intention to forego the lien in favor of some other security." *Nacerima Operating Corp. v. SS AL KULSUM, supra* at 1226. As in the *Nacerima* case, plaintiffs

---

5. Mr. Uiterwyk is Executive Vice President of Uiterwyk Corporation, the successor of both JCU and UTC.

here took no affirmative action either to waive or to retain the lien. Under such circumstances, the strong Congressional policy favoring the supplier of necessaries dictates that the lien must prevail. "Any other rule would effectively emasculate the Congressional intent in the 1971 amendment * * *." *Id.*

Defendants' reliance on *Marshal & Co. v. PRESIDENT ARTHUR,* 279 U.S. 564, 49 S.Ct. 420, 73 L.Ed. 846 (1929) and *John T. Clarke & Sons v. Neris Shipping,* 1974 A.M.C. 1489 (S.D.N.Y.1974) is misplaced. Neither case accords sufficient weight to the clearly expressed Congressional policy embodied in the 1971 amendment. Indeed, the Court in the *Nacerima* case expressly repudiated the holding in *Clarke* as "erroneous on the issue of waiver." 407 F.Supp. at 1224.

■ Insofar as the issue of laches is concerned, the two elements necessary to sustain such a defense are "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Costello v. United States,* 365 U.S. 265, 282, 81 S.Ct. 534, 543 (1961). *See Giddens v. Isbrandtsen Co.,* 355 F.2d 125 (4th Cir. 1966). Although the question whether laches will bar an action of this sort is decided by weighing the equities, courts commonly use the corresponding state statute of limitations as a guide in determining whether there has been a lack of diligence on the part of a plaintiff. *See, e. g., White v. United States Lines,* 254 F.Supp. 480 (D.Md.1965). A federal court sitting in admiralty has more discretion than that allowed to other courts in deciding whether to look to the law of the forum or to the law of the jurisdiction where the cause of action arose for a guiding statute of limitations. *See* Gilmore and Black, § 9–82. That decision should be motivated in part by the equities of the case. *Id.*

On the record here, this Court is satisfied that the law of Louisiana, which has a ten-year statute of limitations (*see* La.Civil Code, Art. 3544), is the more logical guide in these cases. The services at issue were all furnished in Louisiana, both plaintiffs and defendants do substantial business in Louisiana, and there is no real connection between the facts of this case and the State of Maryland. Thus, assuming that defendants had no notice of the respective claims against them until April 1976, such notice was received less than 21 months after the claims accrued, or well within the analogous state statute of limitations.

Furthermore, defendants have not shown that they suffered any prejudice because of this short delay. Plaintiffs diligently pursued Beef and Produce seeking to recover the sums owed, and there is no evidence in this record to indicate that defendants would have been any more successful had they been put on notice from the very start. Accordingly, this Court holds that the defense of laches is unavailable to defeat plaintiffs' claims in these cases.

For the reasons stated, it is this 7th day of November, 1978, by the United States District Court for the District of Maryland,

ORDERED:

1. That the motions for summary judgment filed by defendant Oriens, S.p.A. in both Civil No. H–76–517 and in Civil No. H–76–1115 be and the same are hereby denied;

2. That the motions for summary judgment filed by the plaintiffs in both Civil No. H–76–517 and Civil No. H–76–1115 be and the same are hereby granted;

3. That judgment be and the same is hereby entered in favor of plaintiff Ryan-Walsh Stevedoring Company, Inc. in Civil No. H–76–517 against the defendants, jointly and severally, in the amount of $17,-727.23;

4. That judgment be and the same is hereby entered in favor of plaintiff Ryan-Walsh Stevedoring Company, Inc. in Civil No. H–76–1115 against the defendants, jointly and severally, in the amount of $22,-607.53;

5. That judgment be and the same is hereby entered in favor of plaintiff Jan C.

Uiterwyk Co., Inc. in Civil No. H–76–517 against the defendants, jointly and severally, in the amount of $3,625.42;

6. That judgment be and the same is hereby entered in favor of plaintiff Jan C. Uiterwyk Co., Inc. in Civil No. H–76–1115 against the defendants, jointly and severally, in the amount of $2,304.45;

7. That judgment be and the same is hereby entered in favor of plaintiff Uiterwyk Terminal Corporation in Civil No. H–76–157 against the defendants, jointly and severally, in the amount of $10,881.04;

8. That judgment be and the same is hereby entered in favor of plaintiff Uiterwyk Terminal Corporation in Civil No. H–76–1115 against the defendants, jointly and severally, in the amount of $4,764.35; and

9. That plaintiffs shall recover their costs.